Docket Nos. 90678, 90693, 90706 cons.–Agenda 1–November 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DeANGELO JOHNSON, Appellee.–THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CLYDE COWLEY, Appellee.–THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JIMMIE PARKER, Appellee.

Opinion filed October 17, 2003.–Modified on denial of rehearing January 26, 2004.

JUSTICE RARICK delivered the opinion of the court:

These consolidated cases come before us in the wake of our decision in 
People v. Blue
, 189 Ill. 2d 99, 138-39 (2000), wherein a unanimous court held that the cumulative effect of prosecutorial misconduct and trial error had deprived the defendant of a fundamentally fair trial and thus warranted reversal notwithstanding overwhelming evidence of defendant’s guilt. In 
Blue
, this court recognized that a pervasive pattern of error, engendered in the main by prosecutorial misconduct, had divested defendant of his right to a fair, orderly, and impartial trial, a substantial right that inures to a criminal defendant “ ‘whether guilty or innocent.’ ” 
Blue
, 189 Ill. 2d at 138, quoting 
People v. Bull
, 185 Ill. 2d 179, 214 (1998). In 
Blue
, where the trial was permeated by the presentation of emotionally charged evidence, and the prosecutors “encouraged the jury to return a verdict grounded in emotion, and not a rational deliberation of the facts” (
Blue
, 189 Ill. 2d at 139), the members of this court, acting “as guardians of constitutional rights and the integrity of the criminal justice system” (
Blue
, 189 Ill. 2d at 139), reversed and remanded for a new trial. Disposition of the instant cases requires that we further delineate the dimensions of 
Blue
, applying the principles and standards of review utilized in that case.

Consolidated for purposes of appeal are the cases of
 People v. Johnson
, No. 90678, 
People v. Cowley
, No. 90693, and 
People v. Parker
, No. 90706.

Defendants Cowley and Parker were codefendants of Murray Blue, and their trials involved the same prosecutors. Cowley’s case was severed from Blue’s and the two were tried simultaneously, but with separate juries. Parker’s jury trial took place several months later. Ultimately, Parker and Cowley were each convicted of first degree murder and two counts of attempted murder. In addition, Cowley was convicted of two counts of aggravated battery with a firearm and possession of a controlled substance with intent to deliver; Parker was convicted of two counts of possession of a controlled substance with intent to deliver.

The appellate court reversed the convictions of both defendants, relying upon our decision in 
Blue
. In 
Cowley
, the appellate court noted the errors this court had identified in 
Blue
, and the bases of this court’s disposition in that case, concluding, “Our supreme court reviewed the exact record before us, and we are bound by its findings of error.” 
Cowley
, 317 Ill. App. 3d 834, 842. The appellate court “reverse[d] in accordance with” 
Blue
. 
Parker
, 317 Ill. App. 3d 845, 853. In 
Parker
, the court similarly stated:

“Because the supreme court reviewed a similar record and found error as to identical evidence and similar tactics as evidence[d] in this record, and found that Blue did not receive a fair trial despite overwhelming evidence of his guilt, we are bound by the findings of the supreme court that the errors were so fundamental to the integrity of the judicial process and of such magnitude that the accused here was denied a fair trial. Accordingly, this defendant’s convictions should be reversed as he was denied a fair trial.” 
Parker
, 317 Ill. App. 3d at 850.

The records in 
Parker 
and 
Cowley 
are indeed 
similar
 to that of 
Blue
; they are not 
identical
.

Defendant Johnson was tried before a jury and convicted of first degree murder and three counts of aggravated discharge of a firearm. The appellate court reversed and remanded, stating:

“The defendant claims he was the victim of prosecutorial excess during his murder trial before a jury. He was. He was inaccurately described at trial as a convicted narcotics salesman and a convicted felon. In addition, his failure to testify was argued by inference and his lawyer was referred to as ‘a professional criminal defense lawyer.’

*** We conclude that serious trial errors, taken in combination, were not harmless beyond a reasonable doubt.” 
Johnson
, 317 Ill. App. 3d 666, 667-68.

The appellate court also concluded that it was not required to decide whether any one error would result in reversal. 
Johnson
, 317 Ill. App. 3d at 676-77. The court quoted from 
Blue
: “ ‘Cumulatively, we find that the errors created a pervasive pattern of unfair prejudice to defendant’s case.’ ” 
Johnson
, 317 Ill. App. 3d at 677, quoting 
Blue
, 189 Ill. 2d at 139.

Thus, the common threads that bind these cases for purposes of appeal are alleged patterns of prosecutorial misconduct and related trial error, the utilization of cumulative-error analysis, and reliance upon this court’s opinion in 
Blue
.

The State raises multiple issues, only some of which are actually germane to our disposition of these consolidated cases. Among these are the following arguments. The State contends, “under due process analysis there was no cumulative error that justified the reversal of DeAngelo Johnson’s convictions.” With respect to defendants Cowley and Parker, the State argues that the appellate court misapplied 
Blue
, as there was “no pervasive pattern of prosecutorial misconduct” in either case and the juries were called upon to return verdicts “based on a dispassionate evaluation of the facts and the complex rules of accountability rather than emotion and sympathy for the victim.”

Other issues raised by the State are, in the context of this appeal, little more than requests for abstract pronouncements from this court. For example, the State in oral argument requested that we declare the plain error rule to be a standard of review rather than an exception to the “waiver doctrine.” The State also claims that “the closely balanced evidence test applied to Supreme Court Rule 615(a)’s plain error clause is *** confusing and unworkable, it creates an internal conflict with Rule 615(a)’s harmless error clause, and should therefore be abandoned and replaced by the test used in the federal system to identify plain error.” The State urges us to abrogate our longstanding formulation of plain error analysis and adopt the “federal test,” as set forth in 
United States v. Olano
, 507 U.S. 725, 732, 123 L. Ed. 2d 508, 518, 113 S. Ct. 1770, 1776 (1993). Application of the
 Olano 
standard, the State submits, would result in reversal of the appellate court’s judgment in defendant Johnson’s case.

We have considered these issues; however, for reasons which will become manifest in the course of our discussion, we decline to address them, as they are not pertinent to our resolution of these cases. Although the second prong of plain error analysis 
does
 figure in our resolution of Cowley’s and Parker’s cases, the closely balanced evidence component of plain error analysis is not a factor in our disposition. Since defendants did not object to some of the claimed errors in these cases, we begin with a discussion of basic principles of plain error analysis.

Illinois reviewing courts, faced with allegations of plain error, examine, substantively, on a rudimentary level, the records before them to determine if the claimed errors constitute “plain” and “reversible” errors. 
People v. Keene
, 169 Ill. 2d 1, 17 (1995); 
People v. Terrell
, 185 Ill. 2d 467, 526 (1998) (Freeman, C.J., specially concurring, joined by McMorrow, J.).

Our plain error rule is set forth in Supreme Court Rule 615(a), which states as follows:

“Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.” 134 Ill. 2d R. 615(a).

Our prior decisions make clear that this court may invoke the plain error rule to review alleged errors not properly preserved when (1) the evidence in a criminal case is closely balanced or (2) the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. 
People v. Lindsey
, 201 Ill. 2d 45, 54 (2002), quoting 
People v. Nieves
, 192 Ill. 2d 487, 502-03 (2002); 
People v. Hall
, 194 Ill. 2d 305, 335 (2000);
 People v. Williams
, 193 Ill. 2d 306, 348 (2000). Absent reversible error, there can be no plain error. 
Williams
, 193 Ill. 2d at 348. “[T]o determine whether a purported error is ‘plain’ requires a substantive look at it. But if, in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored.” 
Keene
, 169 Ill. 2d at 17.

Initially, we note that a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain error doctrine. See 
United States v. Young
, 470 U.S. 1, 33 n.16, 84 L. Ed. 2d 1, 24 n.16, 105 S. Ct. 1038, 1055 n.16 (1985) (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.); 
People v. Moss
, 205 Ill. 2d 139, 189 (2001) (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). Indeed, concern over the cumulative effect of errors that “created a pervasive pattern of unfair prejudice,” much of it attributable to misconduct of the prosecutors, is what drove this court’s analysis in 
Blue
. See 
Blue
, 189 Ill. 2d at 138-40. This court recognized in 
Blue 
the “synergistic effect” that multiple errors of this kind can have in a trial. 
Blue
, 189 Ill. 2d at 139. See also 
People v. Hill
, 17 Cal. 4th 800, 847, 952 P.2d 673, 699, 72 Cal. Rptr. 2d 656, 682 (1998) (a unanimous California Supreme Court, foregoing harmless error analysis, reversed a death penalty conviction due to pervasive prosecutorial misconduct and trial errors that, cumulatively, “created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors”).

Blue 
represents an important step this court has taken to stem  prosecutorial misconduct, a problem that courts across the country have, for the most part, been unable or unwilling to control. See P. Spiegelman, 
Prosecutorial Misconduct in Closing Argument: The Role of Intent in Appellate Review
, 1 J. App. Prac. & Process 115, 115-18 (1999) (“Despite long-standing and widespread dissatisfaction, there does not seem to be any substantial change in the perception of the performance of prosecutors or courts. The volume of reported appellate cases of misconduct in argument remains high; there are frequent findings of improper argument, but only occasional reversals; and the volume of scholarly criticism is, if anything, increasing”). To suggest that the problem is proliferating is not to say that it is of recent origin. Roscoe Pound commented on it over 70 years ago. R. Pound, Criminal Justice in America 187 (1930); 1 J. App. Prac. & Process, at 115. Over 50 years ago, Judge Jerome Frank of the Second Circuit Court of Appeals weighed in on the same exasperating issue:

“This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel’s alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, ‘Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of “disapproved” remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial.’ Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court–recalling the bitter tear shed by the Walrus as he ate the oysters–breeds a deplorably cynical attitude towards the judiciary.” 
United States v. Antonelli Fireworks Co.
, 155 F.2d 631, 661 (1946).

See also 
Dardeen v. Wainwright
, 477 U.S. 168, 205-06, 91 L. Ed. 2d 144, 173, 106 S. Ct. 2464, 2484 (1986) (Blackman, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.), quoting 
Antonelli Fireworks Co.
, 155 F.2d at 661; 1 J. App. Prac. & Process, at 116.

Members of 
this
 court have recently expressed concern over the frequency with which this court is seeing instances of prosecutorial misconduct:

“Unfortunately, the kind of courtroom tactics which occurred in this case does not appear to be an isolated occurrence. This court recently cited the conduct of two assistant State’s Attorneys as lacking in maturity and professionalism, once again in a Cook County courtroom during a capital trial. See
 People v. Blue
, 189 Ill. 2d 99, 142 (2000). The frequency with which this court is seeing such behavior is not only alarming, but causes legitimate public concerns regarding the fairness and integrity of these proceedings.” 
Moss
, 205 Ill. 2d at 191 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.).

The 
Moss 
dissent also conveys a sense of exasperation with the “helpless piety” that afflicts our judiciary. In 
Moss
, our distinguished colleagues in dissent observed that threats of reversal, and words of condemnation and disapproval, have been less than effective in curbing prosecutorial misconduct and are unlikely to achieve any greater success in the future:

“It is obvious to me that our admonishments–that such behavior risks reversal–have not been heeded. ***

* * *

*** [M]y colleagues’ disposition of this issue will serve only to embolden those who would engage in such highly charged rhetoric and confuse the trial judges who have to deal with it. This court cannot expect the trial judges to vigorously guard against improper conduct if we ourselves fail to address the problem with any consistency. *** [N]otions of reform ring hollow when this court, faced with conduct which requires reversal, fails to acknowledge it.” 
Moss
, 205 Ill. 2d at 191, 195-96 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.).

Within this milieu, and against the precedential backdrop of 
Blue
, we now turn our attention to the facts of these consolidated cases. We begin with the cases of Blue’s codefendants, Clyde Cowley and Jimmie Parker.

The tragic events of March 8, 1995, and the details of the resulting trials have been set forth with specificity in this court’s opinion in 
Blue
 and the appellate court’s opinions in 
Parker 
and 
Cowley
. We reiterate evidence common to Parker’s and Cowley’s trials as necessary to provide a factual framework for our disposition.

These cases involve two shootings at different times and different locations: the shooting of Victor Young (the first shooting) and, later the same day, the contemporaneous shooting of Officers Daniel Doffyn and Milan Bubalo (the second shooting). The evidence suggests that Young was shot because he sold drugs for a rival street gang and, perhaps, because Blue believed Young had discussed Blue’s activities with the police. The officers were later shot as they tried to apprehend Blue, Cowley and Parker as they fled from Blue’s apartment.

Young testified that, on the day he was shot, he had exchanged words with Blue, who was at the time visible in the first-floor window of an apartment building on Maypole Street in Chicago. When Blue produced a gun, Young began to run and was felled by gunshot wounds to the hip or buttocks. From the ground, Young looked behind him and saw Blue run out of the apartment building, accompanied by Cowley and Parker. Parker was holding a weapon and, at Blue’s direction, also shot at Young. Blue then said, “Let’s get out of here. It’s getting too hot.” Young testified that he saw Blue, Cowley and Parker run through a vacant lot. A few minutes later, Young observed a black Lincoln Continental drive north on Kildare Street. Young knew the car belonged to Blue.

Blue, Cowley, and Parker fled to Blue’s apartment at 750 North Lorel Avenue, which is located across the street from Chicago’s 15th District police station. Because Blue had forgotten his keys, he had to break the glass of his front window to gain entry. That resulted in a neighbor’s report of a burglary in progress.

Officer Elois Jackson testified that she was at the 15th District police station when she heard a report over her police radio of a burglary in progress. Jackson told the dispatcher she could respond to the call. She and several other police officers proceeded to the apartment building across the street, the location given in the report.

Officer Jackson testified that, as she approached the building, she saw Officers Bubalo and Doffyn walking to the front of the building. She entered a gangway at the south side of the building, leading toward its rear. As she reached the far end of the gangway, she was approached by two black males. One carried a gun with his hands extended in front of him. The other male appeared to be unarmed. Jackson keyed in her radio that she had an emergency, pointed her gun at the men, and yelled at them to get on the ground.

The unarmed man, later identified as Parker, raised his hands in the air, but did not immediately go to the ground. The other man turned and started to run away. Eventually, Parker followed Jackson’s command to get to the ground. As he did so, Jackson heard gunfire. Jackson remained behind the wall of the gangway, with her gun trained on Parker, until other officers arrived.

Officer Bubalo testified that he and Officer Doffyn were in the parking lot of the police station when they learned of the suspected burglary across the street. They went to investigate the reported burglary and saw broken glass on the ground from a window next to the entrance of the building. Bubalo testified that he went inside the building followed by Doffyn. Bubalo knocked on the front door of the apartment with the broken window. He heard the sound of several feet running to the back of the apartment and the sound of breaking glass.

Officer Bubalo further testified that Doffyn ran down the steps from the first-floor landing and out of the building. Bubalo followed Doffyn as Doffyn ran from the front of the building to the rear, through a gangway at the north side of the building. When Bubalo entered the gangway, Doffyn was already rounding the far corner of the gangway, into the back yard of the building. According to Bubalo, Doffyn never drew his service weapon at any time.

When Bubalo reached the backyard of the building, he saw Doffyn struggling with a black male. Doffyn had the man, whom Bubalo identified in court as Cowley, in a “bear hug” and Cowley was trying to break free. Almost immediately, Bubalo heard several gunshots fired in quick succession. Both Doffyn and Cowley fell to the ground, with Doffyn lying face down on top of Cowley.

Bubalo testified that, just as Doffyn and Cowley dropped, Bubalo himself sustained a gunshot wound to his left hip. As he fell to the ground, Bubalo saw Blue running toward him from “around the corner.” Blue fired a gun at Bubalo and Bubalo returned fire. Bubalo fired a total of five shots; one struck Blue in the back of the head as Blue ran past Bubalo. This shot caused Blue to fall face forward to the ground, slightly behind Bubalo.

After Blue fell, Bubalo radioed for help, disarmed Blue, and crawled to the aid of Doffyn and Cowley. Bubalo underwent surgery the next day for a total replacement of his left hip. Officer Doffyn died from a gunshot wound to his head.

Police officers searched the first-floor apartment with the broken front window. They discovered that the window of the rear door to the apartment had also been broken. Not knowing whether there were other offenders inside, they entered and searched the apartment. No one was inside. In the living room, they found several bags of marijuana on a table and a jacket with .38-caliber bullets in its pocket. In the bedroom, they found plastic bags containing rock cocaine and folded tin packets containing heroin. Also in the bedroom were $5,385 in cash, a scale and a razor blade. An open box of nine-millimeter cartridges lay on the bed. They did not see any mail, receipts, bills or other papers connecting Cowley or Parker to the apartment. A drinking glass on the living room table had Cowley’s fingerprint on it.

In addition to the foregoing evidence, each defendant gave a statement that was ultimately admitted at his trial. Cowley gave both an oral statement to a police officer, shortly after the shooting, and a subsequent written statement to an assistant State’s Attorney at the hospital. Cowley told the assistant State’s Attorney that on the afternoon of March 8, 1995, Blue, Parker and Charlie “Chow Mein” pulled up in Blue’s Lincoln Continental and told Cowley they had to take care of business with Puff, a rival drug dealer infringing on their territory. Blue gave Cowley a loaded .38-caliber gun to protect himself and “watch the others’ backs.” The four men then went to a building at 4300 Maypole to wait for Puff and his workers. They intended to kill Puff or one of his workers to teach them a lesson. Before Puff or any of his workers arrived, Charlie left the building. Shortly thereafter, Parker saw Charlie talking to Victor Young. Young had sold drugs for Blue in the past, but at the time of the incident was selling drugs for someone else and had been known to “stick up” Blue’s workers. Although Young did not work for Puff, Blue said, “Let’s shoot him,” and started shooting. As Blue, Parker and Cowley left the building to run to Blue’s car, Parker also fired at Young. Cowley still had the .38-caliber gun when they left the scene of the first shooting.

Cowley indicated that they drove down Lake Street fast because they thought Puff’s guys or the police would be looking for them. Their intent was to “chill” at Blue’s apartment and then continue the plan to kill Puff or one of his workers. Blue let Parker and Cowley in the back door of the apartment and told them he had to break the front window because he had forgotten his keys. Blue and Parker went to the bedroom to hide a couple of extra shotguns under the bed, and Cowley went to the living room to drink a glass of soda pop. Parker then reported that the police had arrived. Upon hearing this, Blue stated, “We’re all in this together!” Blue then grabbed the TEC-9 he had just used to shoot Young and followed Parker outside through a window. Cowley, still armed with the .38-caliber weapon, followed Parker and Blue out the window and into the alley. Cowley then heard someone yell, “Police! Stop!” He turned around and ran into a police officer who grabbed him. Blue began shooting and hit the officer and Cowley. Both fell.

Parker’s written statement was consistent with the State’s proof as to the shooting of Young. The written statement also indicated that Parker had placed shotguns under the bed in the bedroom of Blue’s apartment after the shooting of Young and had retrieved some beer from the kitchen. Shortly thereafter, he informed Blue and Cowley that the police had arrived. Parker also stated that, when police knocked on the door, he wanted to grab a gun, but he did not have enough time. When Blue said, “they were all in this,” Parker knew Blue meant they were not going to get caught and would shoot it out. Cowley and Blue grabbed weapons and all three jumped out the window together.

Parker testified at trial, 
inter alia
, that when police began to arrive at the apartment, he had wanted to escape because he thought Cowley and Blue would have a shoot-out with police. He did not want to get caught, and lowered himself out of the window while Blue and Cowley were still in the apartment. He then ran into the alley, but turned around to head to the car. He had escaped from the apartment, unarmed and ahead of his codefendants. Further, Parker testified he was stopped by a police officer before the second shooting involving Officers Doffyn and Bubalo.

In both Parker’s and Cowley’s cases, the State utilized an exhibit and evidence which, in 
Blue
, this court held warranted reversal when considered in conjunction with the prosecutors’ improper closing argument and testifying objections. More to the point, the prosecutors obtained admission and display of Officer Doffyn’s blood- and brain-splattered uniform, they presented the emotionally charged testimony of Officer Doffyn’s father, much of which was irrelevant and obviously intended to appeal to the jury’s emotions, and they succeeded in compounding these errors by the introduction of transparently inflammatory testimony that served only to highlight the ceremonies and oath associated with Officer Doffyn’s service and duties as a police officer, matters irrelevant to defendants’ guilt or innocence.

During each defendant’s trial, the bloodied and brain-splattered uniform of Daniel Doffyn was displayed on a life-size, headless mannequin, which was later taken into the jury room during deliberations. The uniform consisted of Doffyn’s shirts, police jacket and bulletproof vest. The clothing was torn as a result of medical treatment rendered to Officer Doffyn.

In 
Blue
, this court found “the potential prejudice of the uniform outweighed its probative value.” 
Blue
, 189 Ill. 2d at 125. This court observed: “[W]e perceive a coalescence of facts that tip the evidentiary scale from items that are merely useful to those that are aimed directly at the sympathies, or outrage, of the jury.” 
Blue
, 185 Ill. 2d at 126. That pattern was to continue throughout Blue’s trial, and it is impossible not to notice it in the trials of Cowley and Parker as well.

In the trial of these cases, as in 
Blue
, the testimony of Officer Doffyn’s father, Roger Doffyn, was presented by the State, ostensibly for the purpose of identifying the victim as Daniel Doffyn and proving that he was alive, and subsequently died, on the date of the crimes. However, this court in 
Blue 
noted that the State had apparently elicited a portion of Mr. Doffyn’s testimony for another purpose:

“[S]ome of the evidence admitted through Mr. Doffyn, such as the age of his granddaughter, the number of years he has been married to decedent’s mother, and the living arrangements of the Doffyn family, was not probative of defendant’s guilt or innocence. This evidence served only one purpose, namely, to highlight the poignancy of the Doffyn family’s loss and to suggest to the jury that the family’s pain could be alleviated by a guilty verdict. Moreover, the knowledge of these facts surely heightened the impact of the State’s emotional closing argument on the jury.” 
Blue
, 189 Ill. 2d at 131.

In the trial of these cases, as in 
Blue
, the prosecutors presented the testimony of Commander Joseph Delopez of the Chicago police department. In Cowley’s case, Delopez testified in person; in Parker’s trial, the testimony was offered by way of stipulation. Delopez was the commander of the training division of the department. He was present for the “star ceremony” when Daniel Doffyn took his oath of office as a police officer. As part of Delopez’s testimony, the oath of office sworn by Officer Doffyn was read to the jury. The oath states:

“I, Daniel Doffyn, having been appointed to the office of police officer, do solemnly swear that I will support the constitution of the United States and the constitution of the State of Illinois, and that I will faithfully discharge the duties of the office of such to the best of my abilities.”

Delopez was also permitted to testify that Doffyn’s police badge was retired and is now displayed in the “honored star case” at Chicago police department headquarters.

This court in 
Blue 
held that the testimony was irrelevant to the issue of guilt or innocence and speculated whether the evidence was elicited “by design” to intensify the State’s “nakedly prejudicial” closing argument which followed. This court’s comments in 
Blue
 obviously apply to the instant cases as well.

We find no meaningful differences between these three instances of error identified in 
Blue
 and their occurrence and impact in the trials of Cowley and Parker. Indeed, there was no difference at all in the presentation of this evidence in Blue’s and Cowley’s cases, as the two were tried simultaneously in the same courtroom.

As the State notes, one kind of error identified in the evidentiary portion of Blue’s trial is 
not
 present in either Parker’s or Cowley’s case. The juries in these cases were not exposed to the prosecutors’ “testifying objections” during the cross-examination of Etoya Nelson. In a bit of wishful advocacy, the State suggests that this violation of the advocate-witness rule was the “most egregious error” identified in 
Blue
.

While the prosecutors’ conduct in this respect was undoubtedly unprofessional and improper, and certainly contributed to this court’s decision in 
Blue
, the error does not bear the weight the State attributes to it. The subject matter of Nelson’s testimony was relatively insignificant when considered in the context of Blue’s trial. The State had called her to establish Blue’s purported hostility toward police, and his belief that the police were pursuing him in the days preceding the shootings. See 
Blue
, 189 Ill. 2d at 134. The prosecutors’ quibbling with the witness over minor points or collateral issues during the course of that testimony was a factor in this court’s disposition in 
Blue
, but it was hardly the “most egregious error” in that case. Indeed, the predominant feature of this court’s cumulative error analysis in 
Blue
 concerned the prosecutors’ relentless appeal to the jurors’ passions and emotions, culminating in a “nakedly prejudicial” closing argument.

We now consider the State’s closing arguments in these cases, and we begin with the State’s closing argument in Parker’s trial. There is no mistaking that much of the argument was aimed at directly at the sympathies of the jury or was intended to evoke outrage.

Though the prosecutor did not explicitly ask the jury to send a message of support to law enforcement, the jury could not have missed the import of his argument, which was clear from the outset:

“In March of 1995, Daniel Doffyn was a 40 years [
sic
] old rookie police officer. And you have learned, ladies and gentlemen, over the course of the last few days that on March 8, 1995, he was more than just a 40 year old rookie police officer.

You have learned, ladies and gentlemen, that he was a hero. He risked his life in the backyard at 750 North Lorel as did his partner, Milan Bubalo[,] to serve and to protect the people who lived in the 15th District.

And you have also learned, ladies and gentlemen, that in March of 1995, this guy sitting right over here was a gun tooting [
sic
], drug dealing cop killer. And while Dan Doffyn’s duty and oath was to serve and protect, Jimmie Parker’s duties was [
sic
] to maim, kill and destroy.

* * *

And while Dan Doffyn was in the police station at the 15th District with his shiny uniform on, what was then a clean blue uniform shirt and a brand new leather jacket, as Dan Doffyn talked with his partners Dan Doffyn clipped on the radio to his jacket[,] and as Dan Doffyn talked to his sergeant and was told about the days events, who to look out for, how better to serve and protect the good people of the community, this guy was talking about the problems he and his partners are facing in business. About how he and Murray [Blue] and Clyde [Cowley] and the rest didn’t like getting ripped off.”

The prosecutor’s theme and emotional appeal continued as he discussed the events immediately preceding the shooting of Officer Doffyn:

“Dan Doffyn is now struggling with Clyde Cowley as Milan Bubalo told you. And Dan Doffyn was just doing his job. And as he struggled with Dan, with Clyde, Dan Doffyn, who looked like this when he was sworn in to be a police officer for us, to serve us, and to protect us, later looked like this with his head shaved at the Cook County Hospital where they looked at that horrible gunshot wound to his skull. *** And that shiny bright uniform is covered in blood and brain matter.

And a 40 year old hero falls to the ground. And within hours he’s dead.”

We must consider the foregoing remarks in conjunction with others in the prosecutor’s well-orchestrated argument–companion comments which were clearly intended to do service to the same theme and achieve the same end of arousing the jury’s passion and outrage. Although these isolated comments might otherwise occupy the margins of proper argument as exhortations to fearlessly administer justice, an overview of the prosecutor’s argument reveals their dichotomous presentation was likely calculated to avoid the appearance of urging the jurors to use their verdict to send a message of support to the police, a tactic that this court deemed improper in 
Blue
, 189 Ill. 2d at 133. See 
People v. Clark
, 52 Ill. 2d 374, 390 (1972) (“What are you going to tell this community and what are you going to tell 12,000 Chicago policemen?”); 
People v. Swets
, 24 Ill. 2d 418, 423 (1962) (the prosecutor observed that a lot of people were watching the case “and if [defendant] can get away with it there are a lot of sharpies that will figure they can and they’ll try it”); see also 
People v. Slabaugh
, 323 Ill. App. 3d 723, 731 (2001).

Referring to Parker, Cowley and Blue explicitly, and unidentified others implicitly, the prosecutor in this case stated:

“[T]hey think they run this society. Ladies and gentlemen, we are going to ask that you respond affirmatively that they do not. We as a society do not have to live in their twisted world. We do not have to accept their values. We don’t have to allow that to happen in our community. We don’t have to allow these guys blasting sawed off shotguns at other human beings. We as a people can stand together and say, no, you’re not going to do it here. And if you do, you have the–you will be held responsible for your actions.

Consider what the defense is suggesting that you do. Consider the message that they want you to send. That by allowing him to escape responsibility for the actions that he has placed in motion, think about what message would be sent out to the streets. Hey, go ahead and get those sawed off shotguns. Go ahead and plan those murders. Grab your best Tec 9s, your best .38 and get them all over to the drug spots, deal dope and go ahead and blast away.

And when you blast away, go ahead and flee. Flee to another location because there if a police officer responds and gets killed, don’t worry, just say, not me, had nothing to do with it.

Think about that message.”

To the extent that the concept of general deterrence is employed in our criminal justice system, it is generally associated with punishment and imposition of sentence. The broader problems of crime in society should not be the focus of a jury considering the guilt or innocence of an individual defendant, lest the remediation of society’s problems distract jurors from the awesome responsibility with which they are charged. “At least in theory, it should be obvious that any conviction ought to be summarily overturned if it turned out the jurors thought their verdict was supposed to be a referendum on whether their state ought to surrender to some heinous crime, or whether they should convict in order to ‘send a message’ that the crimes charged ‘will not be tolerated in this state.’ ” J. Duane, 
What Message Are We Sending to Criminal Jurors When We Ask Them to “Send a Message” With Their Verdict?
, 22 Am. J. Crim. L. 565, 569 (1995).

We are aware that courts have, in the past, both sanctioned and condemned prosecutors’ exhortations to “send a message” that crime in general will not be tolerated. See 
People v. Chavez
, 265 Ill. App. 3d 451 (1994); 
People v. Batson
, 225 Ill. App. 3d 157, 168 (1992) (prosecutor could properly admonish the jury during closing argument to “ ‘send a message to the community’ that violent crime will not be tolerated”); 
People v. Fluker
, 318 Ill. App. 3d 193, 202-03 (2000) (“[T]he prosecutor [improperly] turned the jury’s attention away from the issues in an effort to turn the case into a referendum on attitudes toward gangs”); 
People v. Herrero
, 324 Ill. App. 3d 876, 888 (2001) (improper for prosecutors to shift the focus of attention away from the actual evidence in the case); 
People v. Martin
, 29 Ill. App. 3d 825, 829 (1975) (“ ‘The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law’ ”).

In 
People v. Harris
, 129 Ill. 2d 123, 159 (1989), this court condoned the prosecutor’s incitement of the jury to do something about crime on the streets:

“Everybody hears about crime. Nobody does anything about it. You have a unique opportunity to actually do something about crime on your streets.” 
Harris
, 129 Ill. 2d at 159.

However, the prosecutor in 
Harris
 concluded with specificity: “ ‘You are the only ones that sit between this man, this ticking bomb, and that door.’ ” 
Harris
, 129 Ill. 2d at 159. This court noted that the remarks “were apparently intended to persuade the jurors to convict because by convicting they would prevent both crime in general, and further crime by this defendant. As such, they were proper.” 
Harris
, 129 Ill. 2d at 159.

To the extent that 
Harris
 and the cases cited therein stand for the proposition that 
limited
 prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent 
solely
 upon its careful consideration of the specific facts and issues before it, we will not disavow the holding of 
Harris
. However, where, as here, the prosecutor blurs that distinction by an extended and general denunciation of society’s ills and, in effect, challenges the jury to “send a message” by its verdict, he does more than urge “the fearless administration of justice,” he interjects matters that have no real bearing upon the case at hand, and he seeks to incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation. In that respect, the prosecutor’s comments were improper.

Moreover, the exhortation to “send a message” was exacerbated by the prosecutor’s attempt to identify and merge his position, on some irrelevant and ethereal level, with the jury, the society, and the community:

“We as a society do not have to live in their twisted world. We do not have to accept their values. We don’t have to allow that to happen in our community. We don’t have to allow these guys blasting sawed off shotguns at other human beings. We as a people can stand together ***.”

We reiterate this portion of the prosecutor’s argument in part to underscore its similarity to an argument held improper in 
People v. Thomas
, 146 Ill. App. 3d 1087, 1089 (1986), where the prosecutor told the jury, “ ‘There’s nobody here for the People, just you.’ ” The appellate court in 
Thomas 
considered the remark plain error, holding that it “was a perversion of the principle that a jury is composed of nonpartisans who function under the presumption that a defendant is innocent until proved otherwise.” 
Thomas
, 146 Ill. App. 3d at 1089. Indeed, such arguments seek to engender an “us-versus-them” mentality that is, as the 
Thomas 
court held, inconsistent with the inherent principles of the criminal trial process.

Moreover, the prosecutor twice utilized a metaphor in his argument on accountability which likened defendant to an animal: “If you run with the pack, you share the kill.” Remarks referring to defendant as an animal are improper. 
People v. Johnson
, 119 Ill. 2d 119, 139 (1987); see 
People v. Ivory
, 333 Ill. App. 3d 505, 517 (2002) (the prosecutor stated that defendant was “ ‘just a wolf in sheep’s clothing’ “ and was “ ‘part of a pack of predators’ ”). The prosecutor, near the conclusion of his argument, quoted the English statesman Edmund Burke, stating, “All it takes for evil to thrive [is] for good men and women to do nothing.” The prosecutor immediately followed up with the entreaty, “Ladies and gentlemen, we ask that you do something today.” Again, such tactics serve only to divert the jury’s attention from the more tangible issues to be considered. It is improper to characterize a defendant as “evil”or to cast the decision of the jury as a choice between “good and evil.” 
People v. Hudson
, 157 Ill. 2d 401, 457 (1993); see 
People v. Williams
, 295 Ill. App. 3d 456, 467 (1998).

The prosecutor also mischaracterized evidence and the applicable law, and suggested that the defense was deceptive in its dealings with the jurors.

The prosecutor repeatedly stated that defendants had “celebrated” by drinking beer upon their return to Blue’s apartment after the first shooting.

“And think about who Jimmie Parker is at that moment. Picture if you will, just twenty minutes earlier you have fired a loaded sawedoff shotgun at an unarmed human being. What do you do?

Does it affect you? Does it bother you? It didn’t bother Jimmie. He goes into the kitchen, grabs a couple of bottles of beer for him and his buddies and they have a few cold ones. And he sits there and he watches a tape. That is cold blooded.

* * *

He drinks with Murray Blue. He celebrates shooting other human beings with Murray Blue.

* * *

They, as we had heard, they were having their beers. They were celebrating and the sad part about it is most of us in civilized society celebrate life.

These guys were celebrating death. And you have to look at the person inside and their actions to determine what they actually meant that day. And I submit to you those actions speak volumes about the soul of Jimmie Parker.”

There was no evidence that Parker, by drinking beer after the first shooting, was “celebrating death.” This is simply another instance of the prosecutor’s tactic of attempting to stir outrage in the jury. Moreover, evaluation of Parker’s soul was not a matter for the jury’s consideration: the jury was charged with determining Parker’s guilt or innocence by applying the applicable law.

At one point in his argument, when he was discussing the law of accountability, the prosecutor incorrectly advised the jury that Parker’s state of mind was irrelevant to guilt or innocence, then, after an objection was overruled, suggested that the defense was engaging in deception or trying to confuse the jury.

“[U]nder the law Jimmie Parker killed Dan Doffyn, too.

* * *

That’s the law that you told us under oath you would uphold, you would enforce. Regardless of what was going through Jimmie Parker’s mind, when he jumped out that window that afternoon on North Lorel, whatever was going through his mind, that don’t [
sic
] matter.

MS. GROHS: Objection. That is not the law.

THE COURT: Overruled. He may argue.

[Assistant State’s Attorney]: That’s the law. They don’t want you to read the law.”

Unless predicated on evidence that defense counsel behaved unethically, it is improper for a prosecutor to accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception. See 
People v. Kirchner
, 194 Ill. 2d 502, 551 (2000); 
People v. Kidd
, 147 Ill. 2d 510, 541-42 (1992); see also 
People v. Abadia
, 328 Ill. App. 3d 669, 683 (2001).

Later in rebuttal argument, the prosecutor again implied (ironically) that the defense was interested in something other than a result grounded on the applicable law.

“Remember when we stepped up here and we were selecting you folks as jurors. We were very brief in what [we] wanted to know. We wanted to know ourselves based on your answers to the questions that Judge Kelley posed to you, whether or not you were good solid citizens and we were confident that each of you were.

You represent your community. And we are content with each and every one of you. Secondly, we wanted to know if you would follow the law. And that was it. That’s all we wanted to know. And we sat down.

Now, defense counsel asked all sorts of other questions.

MS. GROHS: Objection. We have the right to ask questions. He makes it sound like we did something improper.

THE COURT: There is nothing improper about it. He can argue. Go ahead.”

Although the prosecutor did, immediately thereafter, acknowledge that it was not improper to ask additional questions, the ambiguity of the trial court’s ruling on the objection may well have reinforced the impression of defense deception left by the State’s earlier comment.

Although instances of identified error in the prosecutor’s closing argument at Parker’s trial are already legion, we note, in conclusion, two final examples of irrelevant argument obviously intended to inflame the passions of jurors. In two instances, early in his closing argument, the prosecutor made reference to a school’s proximity to the location where the defendants parked upon their return to Blue’s apartment.

“You will notice, folks, that they didn’t park out front where the police station is. They parked right by a grammar school.

* * *

And with these guns on a school day with children in that school, they walk these guns into that apartment.”

The proximity of the school to Blue’s apartment was irrelevant to any issue properly before the jury.

Finally, as in 
Blue
, the prosecutor interjected references to Officer Doffyn’s family that, given their context, can only be construed as strained attempts to invoke the jury’s sympathy and thus influence its decision.

“You know what is even more sad, more pathetic[,] is the Doffyn family has to live with the understanding that one of the last persons to see their son alive is this guy.

He peered out that window and saw a forty year old police officer, who just left his family, family didn’t even see him last. He did.”

The quoted remarks shed no light on the pertinent issues in this case. They were not probative of defendant’s guilt for the several crimes with which he was charged. They are nothing more than thinly veiled, emotion-laden appeals to the jury, meant to intensify improper evidence previously introduced and to reinforce the poignancy of the Doffyn family’s loss. Such matters were irrelevant at that point in the proceedings. The comments improperly shifted the focus of attention away from the actual evidence in the case. See generally 
Herrero
, 324 Ill. App. 3d at 888. They are the same kinds of remarks we held improper in 
Blue
. See
 Blue
, 189 Ill. 2d at 132-34.

As in 
Blue
, we see in this case cumulative error and a pervasive pattern of unfair prejudice that denied defendant a fair trial and cast doubt upon the reliability of the judicial process. See 
Blue
, 189 Ill. 2d at 139. We note that the prejudice in this case, as in 
Blue
, was engendered in the main by prosecutorial misconduct. As in 
Blue
, the coalescence of improper, emotion-laden evidence, and inflammatory argument obviously designed to exploit that evidence, created a synergism of parallel errors. See 
Blue
, 189 Ill. 2d at 134, 139. As in 
Blue
, a new trial is necessary in this case to preserve and protect the integrity of the judicial process, as “the trial court allowed the guilty verdict to rest on considerations other than the evidence alone.” See 
Blue
, 189 Ill. 2d at 138-40. Thus, we affirm the judgment of the appellate court in cause No. 90706.

In passing, we note that our disposition would be the same had we applied the 
Olano 
standard. Under 
Olano
, a reviewing court can correct an error not raised at trial, if there is “(1) ‘error,’ (2) that is ‘plain,’ and (3) that ‘affect[s] substantial rights.’ [Citation.] If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error ‘ “ ‘seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.’ ” ’ [Citation.]” 
Johnson v. United States
, 520 U.S. 461, 466-67, 137 L. Ed. 2d 718, 727, 117 S. Ct. 1544, 1548-49 (1997), quoting 
United States v. Olano
, 507 U.S. 725, 732, 123 L. Ed. 2d 508, 518, 113 S. Ct. 1770, 1776 (1993). With regard to the two critical factors in that test, we note that pervasive prosecutorial misconduct which is designed to “encourage[ ] the jury to return a verdict grounded in emotion, and not a rational deliberation of the facts” (
Blue
, 189 Ill. 2d at 139), adversely affects a defendant’s “substantial right” to a fair trial, and in our view certainly qualifies as a structural “ ‘defect affecting the framework within which the trial proceeds.’ ” See generally 
Johnson
, 520 U.S. at 468, 137 L. Ed. 2d at 728, 117 S. Ct. at 1549, quoting 
Arizona v. Fulminante
, 499 U.S. 279, 310, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1265 (1991). Moreover, with respect to the final 
Olano 
factor, pervasive prosecutorial misconduct of the kind that contaminated the proceedings in 
Blue 
and this case clearly undermines the “trustworthiness and reputation of the judicial process,” affecting the very “integrity of the judicial process” itself, as this court unanimously acknowledged in 
Blue
. 
Blue
, 189 Ill. 2d at 138-39. In 
Blue
, we held those considerations warranted reversal irrespective of the state of the evidence. The facts of this case dictate the same result.

We now turn our attention to Clyde Cowley’s case. Many of the errors we have noticed in Blue’s and Parker’s trials occurred in Cowley’s trial as well. Therefore, our discussion of the legal principles applicable thereto applies with equal force to disposition of the State’s appeal in cause No. 90693. Of course, Cowley was tried simultaneously with Blue; therefore, with the exception of the prosecutors’ violation of the advocate-witness rule, the identical evidentiary errors identified in 
Blue
 were also present in Cowley’s trial. Specifically, Cowley’s trial was tainted by the display of Doffyn’s bloodstained, brain-splattered uniform and the irrelevant, inflammatory portions of testimony given by Roger Doffyn and Commander Joseph Delopez.

There are also striking parallels in the prosecutors’ closing arguments in the three trials. The similarities are obvious from the outset of the State’s closing argument in Cowley’s case.

“Ladies and gentlemen, on March 8th, 1995, Daniel Doffyn said good-bye to his daughter, Britanny, for the last time. While she was in school, Daniel Doffyn put on his uniform for the last time. He put on his badge for the last time. He put on his gun and holster for the last time. He said good-bye to his mom and his dad for the last time, and he went to work. He went to work at the 15th District because he was a Chicago Police Officer.

He went to work with that oath that he took at that star ceremony just a few months before where he promised that he would uphold the laws of the State of Illinois and the Constitution of the United States, and he went to the roll call room for the last time, and he got his radio and put it in its holster for the last time.

And he went outside in the parking lot waiting for his partner, about to begin his shift, and you know what happened just a few minutes later, and you know why you can’t meet Dan Doffyn today.”

Later, the prosecutor used the same predatory metaphor we found objectionable in his closing argument in Parker’s case: “If you run with the pack, you share in the kill, and he never broke from the pack.”

The prosecutor included the same irrelevant reference to the nearby grammar school. Referring to the location where Blue’s car was parked when the defendants returned to Blue’s apartment after the first shooting, the prosecutor stated, “It’s parked down the way right by the grammar school with the kids ready to get out.”

We see in the prosecutor’s closing argument the same exhortation to “send a message” to the community:

“Consider, ladies and gentlemen, what the defense wants you to do. Consider the message that they want you to send. By not holding him responsible, consider what message that would give this guy and all others like him.

* * *

We do not as a civilized society have to live in this twisted world that they attempt to drag us into. We do not have to put up with it. We do not.”

Finally, as he did in Parker’s closing argument, the prosecutor in Cowley’s case ended his argument by casting the jury’s decision as a choice between good and evil:

“What they want, ladies and gentlemen, is for you folks, good citizens of our community, to do nothing. To do nothing. There was an English statesman by the name of Edmund Burke, and one of the things he said was all it takes for evil to thrive is for good men and women to do nothing. Ladies and gentlemen, do not let evil thrive in this community.”

We have discussed the legal principles applicable to comments of this kind, and we need not reiterate them here. Suffice it to say that these remarks are improper. Their prejudice is enhanced by the parallel evidence the State adduced in this case. Although we acknowledge that much of the middle portion of the State’s argument was properly based upon relevant evidence and represents a studied and laudable discussion of principles of accountability, we believe that the coalescence of the factors we have discussed in this opinion requires a new trial and affirmance of the appellate court’s judgment, as a means of preserving the integrity of the judicial process. Thus, we affirm the judgment of the appellate court in cause No. 90693.

We need not render a 
pro forma 
accounting of which errors were properly preserved for purposes of appeal and which were not, as the second prong of our plain error analysis clearly justifies affirmance of the judgments of the appellate court in these cases. As the appellate court held in each case, the evidence is sufficient to support retrial. Therefore, there is no double jeopardy bar to new trials. See 
People v. Dennis
, 181 Ill. 2d 87, 110 (1998).

Before turning our attention to DeAngelo Johnson’s case, we feel compelled to reiterate that prosecutorial misconduct, such as that which permeated the trials of Blue, Parker, and Cowley, undermines the very foundations of our criminal justice system. Our system of justice requires that a defendant’s guilt or innocence be determined based upon relevant evidence and legal principles, upon the application of reason and deliberation by a jury, not the expression of misdirected emotion or outrage by a mob. Though perhaps not as egregious as the prosecutors’ misconduct in these cases, we are seeing such behavior with an “alarming” frequency, which “causes legitimate public concerns regarding the fairness and integrity” of criminal trials. See 
Moss
, 205 Ill. 2d at 191 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). Misconduct on the part of prosecutors cannot be allowed to continue unchecked. To call it “error” is to mischaracterize it, as it represents nothing less than an attempt to subvert a defendant’s fundamental right to a fair trial. Multiple instances of this kind of conduct in the course of a criminal trial threaten the trustworthiness and reputation of the judicial process (
Blue
, 189 Ill. 2d at 139), and this court will take corrective action to preserve the integrity of the process (
Blue
, 189 Ill. 2d at 138). We mean it as no hollow warning when we say that prosecutors risk reversal of otherwise proper convictions when they engage in conduct of this kind. See 
Moss
, 205 Ill. 2d at 179 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.) (“Our past ‘messages’ appear to go unheeded as this case more than amply demonstrates”); 
People v. Kitchen
, 189 Ill. 2d 424, 435 (1999) (this court sent “a clear message to both bench and bar” regarding a defendant’s due process rights in postconviction proceedings).

We now consider the State’s appeal in cause No. 90678, the case of DeAngelo Johnson. In the appellate court, Johnson raised five issues, claiming that he had been denied a fair trial by: (1) improper evidence of his gang membership; (2) veiled evidence he had failed a polygraph test; (3) evidence of his prior arrests and “convictions”; (4) the prosecution’s closing argument; and (5) his attorney’s ineffectiveness. The appellate court noted that Johnson had “failed to raise the first three issues in a post-trial motion and did not consistently object in a timely manner.” 
Johnson
, 317 Ill. App. 3d at 668. Johnson attributed those omissions to ineffective assistance of counsel. The appellate court did not address Johnson’s contention of ineffective assistance, as it determined that the failure to preserve the issues implicated the plain error rule. 
Johnson
, 317 Ill. App. 3d at 668-69. The appellate court then considered Johnson’s first four issues and ultimately concluded that the third and fourth issues were meritorious and, “ ‘[c]umulatively,’ ” those errors “ ‘created a pervasive pattern of unfair prejudice,’ ” warranting reversal of Johnson’s convictions. 
Johnson
, 317 Ill. App. 3d at 677, quoting 
Blue
, 189 Ill. 2d at 139.

We begin with a recitation of the facts we consider pertinent to our resolution. On August 23, 1996, two young men wearing black sweatshirts fired gunshots into a group of people gathered near a bar on Chicago’s west side. Four persons were hit by bullets; Gary Thomas died as a result of his gunshot wounds. Johnson and Bernard Williams were ultimately indicted for first degree murder, attempted first degree murder, aggravated battery with a firearm, armed violence, and aggravated battery. On November 10, 1998, a jury found Johnson guilty of first degree murder and three counts of aggravated discharge of a firearm.

 Prior to trial, Johnson filed a motion to suppress his confession. At the hearing on that motion, Dr. Dawna Gutzmann, a staff psychiatrist at Forensic Clinical Services for the Circuit Court, testified that, in her opinion, Johnson was mildly retarded and cognitively impaired. She believed Johnson, who was 17 years old at the time of the offense, was not capable of knowingly and intelligently waiving his 
Miranda 
rights. Dr. Daniel Hardy, a psychiatrist hired by defense counsel, agreed with Dr. Gutzmann’s diagnosis and conclusions.

Dr. Stafford Henry, Gutmann’s colleague at Forensic Legal Services, testified to a diametrically opposed conclusion. Henry believed that Johnson’s apparent limitations in understanding were deceptive and self-serving, that he had normal intelligence with no gross cognitive impairment, and that he was capable of understanding and waiving 
Miranda 
rights. Assistant State’s Attorney Susan Zeigler, who interviewed Johnson and prepared his written statement, testified to the measures she took to ensure Johnson’s understanding of his rights. She indicated that Johnson was able to read a preprinted form setting forth his constitutional rights. She also explained those rights to him. Her testimony does suggest that Johnson’s reading ability was somewhat limited and he required additional explanation as to some aspects of his 
Miranda 
rights. After she took Johnson’s statement, she went over it with him and there were additions and corrections made to the statement. Johnson then signed each page of the statement.

Johnson testified that Detective Kristen Kato beat him during interrogation. Kato promised to let him go if he took and passed a polygraph test. Detective Kato testified that he never abused Johnson and the polygraph examination was Johnson’s idea.

The circuit court found the State’s witnesses more credible and denied Johnson’s motion to suppress. Thereafter, Johnson and Bernard Williams were tried in simultaneous, but severed, proceedings.

Prior to trial, defense counsel made a motion 
in limine
, requesting “that there be no questions asked concerning [Johnson’s] prior arrest or convictions.” The trial court responded:

“Appellate courts have repeatedly held that prior contact with the police department[ ] and whether or not the person had previously been read and advised of his constitutional rights in an arrest situation were highly relevant to whether or not this person understood his 
Miranda 
rights.”

Although the court’s comments indicated its intent to allow questioning as to Johnson’s prior experience with the criminal justice system, the court never explicitly so ruled. Thus, the prosecutor sought to clarify the court’s ruling:

“[J]ust so I am clear, those are factors that go to whether or not, whether he knowingly, intelligently waived the 
Miranda 
rights. If [defense counsel] is going to call an expert to say that this defendant cannot knowingly, intelligently waive his 
Miranda 
warnings, those are areas that I can explore, it’s something that [Dr. Gutzmann] considered or not [
sic
] considered. *** But I should be allowed to question with regard to the issue.”

Immediately thereafter, defense counsel interjected that he understood the court’s ruling and he directed the court’s attention to another motion. Thus, the breadth of the court’s ruling was not clearly established. It does not appear that the court balanced the prejudicial impact of such evidence against its probative value.

 Also prior to trial, the prosecutor made a motion 
in limine
 to allow evidence of Johnson’s gang affiliation. The trial court provisionally indicated it would not allow the evidence, but noted it would revisit the issue during trial if warranted.

At trial, the State presented the eyewitness testimony of Martin Nash. Nash was a member of the Dog Pound street gang, as was the target of the shooting, Eric Smith, also known as “Puff.” Nash testified that he, Puff, Gary Thomas, and Irving Young were standing on the street when Puff advised them of the approach of two men, stating, “Man, look, here come those mother fucker niggers; man, mother fucker travelers.” When the prosecutor asked Nash what Smith meant, defense counsel objected.

In a sidebar conference, the prosecutor explained his view of the motive for the shooting:

“The Dog Pound is trying to recruit a couple of Traveling Vice Lords to sell drugs for the Dog Pound. The Dog Pound is a renegade street gang comprised of many different street gangs, most of whom are Vice Lords. He [Smith] tries to recruit two people to come to his gang to sell drugs for him. There may have been a previous altercation, but the retaliation by the Traveling Vice Lords is to get Puff, the leader of the Dog Pound. It is clear it is a gang motive. It is a gang retaliation.”

The court overruled the objection: “I will allow the State to continue this line of inquire [
sic
] on the basis that the statement apparently indicates the reason for their going after Puff. And that being so, if Puff is a member of a different gang as related by this person who knows Puff, I would allow it.”

When testimony resumed, Nash stated that he understood Puff’s comment to mean that members of the Traveling Vice Lords street gang were approaching. Nash said he looked up and saw two persons walking toward him. They were wearing black hoods, black sweatshirts and black leather gloves. Nash identified the two men as Johnson and codefendant Bernard Williams. Nash stated that Johnson and Williams came to within 20 feet of him when they produced weapons and opened fire. Nash and those with him fled. Thomas was felled by the gunfire.

Nash later spoke with officers at Cook County Hospital and told them he would recognize the shooters if he saw them again. He indicated that Puff would probably know who they were because they were members of the Traveling Vice Lords street gang. Nash testified that officers later showed him a photo array, and he identified both Johnson and Williams. He subsequently picked them out of a lineup at the police station. The jury was apprised that Nash was serving a four-year narcotics sentence at the time of the trial, and he had been previously convicted of burglary.

Detective Kriston Kato testified that he was assigned to the investigation of this case. On September 2, 1996, Kato and his partner located and spoke to Puff. Thereafter, they began looking for Williams. They obtained a photograph of Williams and showed Nash a photo array that included the Williams photo. Nash identified Williams as one of the shooters. Kato testified that, contrary to Nash’s testimony, Nash had identified 
only
 Williams, as there had been no photograph of Johnson in the photo array. Kato eventually located Williams driving a car in which Johnson and Shawn Harris were passengers. All three men were taken to Area Four headquarters. Williams initially claimed that Harris and Johnson could provide him an alibi. After the police interviewed Harris, Johnson became a suspect.

Prior to questioning, Johnson was advised of his constitutional rights. He indicated he understood and agreed to speak with the officers. Johnson denied any knowledge of, or involvement in, the shooting, stating he had been in Evanston at the time. When he was confronted with information obtained from Williams and Harris, Johnson said they were lying. When the officers asked Johnson about his alibi, he was unable to provide any specific information about his whereabouts in Evanston. Kato told Johnson they would conduct a lineup after Kato had located a witness. Johnson agreed to participate in a lineup in order to prove that Williams and Harris were lying. Both Williams and Johnson participated in the lineup, and Nash identified them as the shooters.

After the lineup, Johnson was again advised of his rights and agreed to speak with the officers. Kato testified that Johnson continued to deny involvement in the shooting even after the officers advised him he had been identified in the lineup. Kato then confronted Johnson with additional information obtained from Williams. According to Kato, Johnson asked to be interviewed by another investigator at Chicago police headquarters at State and 11th Streets and suggested that Williams submit to an interview by the same investigator. Kato scheduled the interview for Johnson and then asked Williams if he wanted to participate. Williams eventually declined.

When Johnson was returned from “the interview,” he was again advised of his rights and was “confronted with the results *** of his interview downtown.” According to Kato, Johnson then agreed to tell the truth. He admitted that his real name was DeAngelo Johnson, not Donald Ware, as he had led the officers to believe. According to Kato, Johnson said he and Williams had shot at the members of the Dog Pound because they had been harassing and shooting at Williams. The primary target was Puff. The conflict between Williams and Puff was the result of Williams’ refusal to sell drugs for Puff. Johnson acknowledged his membership in the Traveling Vice Lords street gang.

According to Kato, Johnson then gave a statement regarding the shooting. Johnson said he was driving Williams’ car when they observed Puff and the other Dog Pound members standing in front of a liquor store. Johnson said he and Williams then went to a friend’s house and obtained two nine-millimeter handguns, two black hooded sweatshirts and two pairs of gloves. Thereafter, they returned to the liquor store, parked nearby, got out of the car, and approached Puff and the other Dog Pound members. They fired at Puff and “Elroy” from a distance of 15 to 20 feet, and then fled on foot. Johnson said he threw his gun in the park on his way home. He and Williams later burned the sweatshirts and gloves. Kato testified that he had advised Johnson of his rights on three separate occasions, and Johnson had never asked him to explain or clarify those rights.

Assistant State’s Attorney Zeigler offered testimony substantially similar to that she had given at Johnson’s suppression hearing. Initially, she advised Johnson of his rights, and he indicated he understood. She then spoke with him about the murder of Gary Thomas. After a 30-minute conversation, Johnson agreed to give a handwritten statement. Prior to the preparation of this statement, Zeigler spoke with Johnson outside the presence of Detective Kato to determine how Johnson had been treated by the police. Johnson said he had been treated well and had no complaints.

Kato then returned to the room and Zeigler wrote out Johnson’s statement. Zeigler asked Johnson to demonstrate his ability to read and write. She had him read aloud the preprinted rights form and the first paragraph of the handwritten statement. After Johnson read the form, Zeigler had him sign the waiver. At one point, Johnson sounded out the word “constitutional,” and Zeigler asked him if he understood what the word meant. Johnson said he did not. Zeigler explained that the term referred to the rights they had just read, and Johnson then indicated he understood. After the statement was finished, Zeigler went over the statement with Johnson word for word and gave him the opportunity to make additions or corrections, which he did. Thereafter, Johnson signed each page of the statement. Zeigler read the statement to the jury:

“DeAngelo and Bernard were in a car when they saw [Eric Smith,] Puff. When they saw Puff he was with three of his friends[,] one was Elroy. When they saw Puff they decided to go and get guns to teach him a lesson to leave DeAngelo and Bernard alone. Puff was the leader of a gang called the Dog Pound. When DeAngelo and Bernard wouldn’t sell drugs for Puff he threatened them. On Aug 21, 1996 Puff shot Bernard’s house up meaning they [
sic
] fired 15 shots into Bernard’s house. So on Aug 23, 1996 when Bernard and DeAngelo saw Puff they decided to teach Puff a lesson.”

The State presented evidence that nine-millimeter cartridge casings were recovered from the scene of the shooting. Two bullets were recovered and examined, and they too were from a nine-millimeter weapon.

The defense presented two witnesses: Dr. Dawna Gutzmann and Cordelia Parker, Johnson’s eighth-grade special education teacher. Both witnesses testified that Johnson had low intelligence and limited reading and comprehension skills.

Parker testified that, when the 1992 school year began, Johnson was reading out of a third-grade reading book; however, she believed he had advanced to a fourth-grade reader by the end of the year. He passed a modified constitution test and graduated from elementary school pursuant to a Chicago Board of Education policy that required the promotion to high school of all students over 15 years of age. Parker acknowledged that her report on Johnson indicated that his ability to express himself verbally was adequate.

Gutzmann testified she was appointed to interview Johnson and did so on separate occasions. The purpose of her initial examination was to form and render an opinion regarding Johnson’s ability to comprehend 
Miranda 
warnings and waive his constitutional rights. She first advised Johnson that what he said was not confidential and what he said could later be brought out in court. Gutzmann said she discovered that Johnson had not understood her initial explanation. After she repeated it several times, Johnson indicated he understood.

In her first interview with Johnson, Gutzmann questioned Johnson about the meaning of key concepts regarding 
Miranda 
warnings. Johnson told her he had never signed a statement prior to the one at issue in this case. Gutzmann reviewed some pertinent psychological reports and learned that Johnson had a score of 57 on a verbal subtest of the Wechsler Intelligence Test. She noted that a complete IQ test involves more than just the verbal test.

Based upon her initial interview, Gutzmann made a provisional diagnosis of major depressive disorder and mild mental retardation. She noted that a firm diagnosis would require additional information regarding Johnson’s adaptive functioning and a full IQ test. After her initial meeting with Johnson, it was her impression that he had dependent features to his personality which were manifest in a tendency to be deferential. Johnson seemed to have low self-esteem, and he appeared to be easily influenced by her authoritative position.

In her second examination of Johnson, Gutzmann tried to obtain more information about a prior arrest and Johnson’s recollection of it. With respect thereto, Johnson said he could not recall having been given 
Miranda 
warnings.

In her first and third examinations of Johnson, Gutzmann discussed with him the statement he had given in this case. She reviewed with Johnson the typewritten portion of the statement that set forth 
Miranda 
warnings. With the exception of the phrase “I understand that I have the right to talk to a lawyer,” Johnson indicated he either did not understand, or could not explain, the preprinted rights. When Gutzmann asked Johnson about the meaning of various words of the 
Miranda 
warnings, taken out of context, he appeared confused. For example, when asked the meaning of the word “right,” he responded, “like on paper.” When asked about the word “present,” he took it to mean a gift. When asked, “What does question mean?” he responded, “Somebody telling you something.” He did associate “court” with courtroom and “lawyer” with a person who could defend him in court.

Gutzmann asked Johnson to read a part of the handwritten statement. According to Gutzmann, he read the simpler, shorter words and skipped the longer, more complex words. Gutzmann rendered her opinion that Johnson was not capable of reading all the words in the statement. Gutzmann believed that Johnson was not malingering.

By the time of the third interview, Gutzmann had Johnson’s school records from 1991. Johnson had attended classes for children with learning and behavioral disabilities. At that time, defendant was reading at a fourth-grade level. The school records revealed that Johnson last attended school in June of 1993, but Gutzmann did not have test results for that time period when she did her initial evaluations. Gutzman stated that it is commonly believed a sixth-grade reading level is required to understand 
Miranda 
warnings. She acknowledged that IQ is only one factor to consider in determining whether a person is capable of waiving his or her rights. Gutzmann acknowledged that a mentally retarded person who has had experience in the judicial system might have gained pertinent knowledge from that experience. However, it was Gutzmann’s opinion that Johnson was not capable of knowingly and intelligently waiving his constitutional rights. She also believed he was more susceptible to suggestion than the average person.

Gutzmann conceded that defense counsel had provided her with records indicating Johnson’s full-scale IQ might have been as high as 80 at some point. She stated she had received that information after she had rendered her initial opinion, but it had not changed her opinion. After she had received Johnson’s full-scale IQ scores, she 
did 
change her opinion regarding Johnson’s overall intellectual capacity, concluding that he was 
not 
mentally retarded. Gutzmann also admitted she had belatedly received a computer printout indicating that Johnson’s reading level was 6.7, or the sixth grade, seventh month, but she said the way he read to her was not consistent with the sixth-grade assessment. Other records she subsequently obtained where consistent with her assessment of fourth-grade reading skills. Gutzmann said she was aware that defendant had been previously arrested and she assumed he had been read the 
Miranda 
warnings. She had taken that information into account in rendering her opinion that Johnson had not knowingly and intelligently waived his constitutional rights.

Gutzmann’s testimony on cross-examination revealed that Johnson had not been entirely forthcoming in the information he had provided her. Although he told her he had never had a job, she knew he had actually had two different jobs. Though he told her he had only been arrested once, she later learned he had been arrested more than once.

Gutzmann stated she would find it relevant if she had known that Johnson had been given 
Miranda 
warnings on three separate occasions, but it would not change her opinion because she believed a person’s familiarity with the criminal justice system does not necessarily guarantee that he understands his rights. Gutzmann noted that it is the experience of giving up rights and actually suffering consequences as a result thereof that causes people to comprehend the significance of those rights. She knew Johnson had been arrested before, and she assumed he had been read 
Miranda 
warnings, but she did not have any specific information to that effect.

Toward the latter stages of the prosecutor’s cross-examination of Gutzmann, he asked whether Gutzmann had “taken into account the defendant’s background that he had actually been convicted of two separate crimes in 1994.” Defense counsel requested a sidebar. The trial court denied the request for a sidebar and sustained “the objection.” A short time later, the prosecutor asked, “Would you consider it relevant if the defendant had previously spent time in the Department of Corrections?” An objection was overruled, and the witness responded, “Well, its relevant but I wouldn’t know what to make of it.” The prosecutor continued, “And it’s relevant because people who are housed in the Department of Corrections often talk about their cases, don’t they?” Defense counsel objected that the question called for speculation. The court sustained the objection.

On redirect examination, defense counsel asked Gutzmann about defendant’s previous charges: “Now you heard [the prosecutor] talk about 
Miranda 
warnings having been given in the past to Mr. DeAngelo Johnson. Had Mr. DeAngelo Johnson ever been charged with murder before in the past?” Gutzmann responded that he had not.

On re-cross-examination, the prosecutor asked Gutzmann first about the nature of Johnson’s prior charges, then about his prior “convictions,” and finally whether Johnson had been represented by counsel during those proceedings:

“Q. He was arrested in 1994 on two separate occasions for selling narcotics?

A. Okay.

Q. He was convicted on both of those charges?

A. Okay.

Q. Before being convicted on any of those charges, he was sent to court and had a lawyer appointed for him?

A. All right.

Q. He had a lawyer represent him throughout the first charge of selling narcotics?”

Before Dr. Gutzman could answer, defense counsel objected. The court said, “I don’t know if the witness will be able to answer that. It would be hearsay.” The prosecutor continued: “You are aware that the defendant spent time in custody on those crimes?” The court then sustained a defense objection to the relevance of that line of questioning.

The State presented the testimony of Dr. Stafford Henry to rebut Dr. Gutzmann’s testimony. Henry said when he tried to ask Johnson about his 
Miranda 
rights, Johnson repeatedly stated,”I don’t know,” or “I can’t catch on.” Johnson told Henry that this case was his first contact with the criminal justice system. Henry informed Johnson he was aware of Johnson’s criminal history. Based on that occurrence and other information, Henry stated his opinion that Johnson was being “untruthful.” Henry testified that Johnson’s responses regarding the circumstances of his arrest indicated that he was thinking clearly on the day he was arrested. Johnson appeared to be of average intelligence. It was Henry’s opinion that Johnson understood and was able to voluntarily, knowingly and intelligently waive his 
Miranda 
rights.

In his closing argument, the prosecutor discussed Detective Kato’s testimony and the events leading up to Johnson’s custodial statement:

“[Johnson] knows they are on to him. He knows they are–it’s starting to stack up against him. One last chance. Let me go downtown. I’ll show you. When he bombs that and he comes back in, he’s confronted with the results of his interview downtown, he knows it’s over.”

Defense counsel did not object to this argument. Again speaking of Johnson’s statement, the prosecutor made the following comments:

“There is absolutely no evidence before you to attack the validity of [Johnson’s inculpatory] statement. Nothing. It is uncontested. An attorney can stand before you and argue all he wants about what he wishes the statement to say or what it doesn’t say. But you know what? There is no evidence to contradict the validity of the statement. None.”

Later, referring to Johnson, the prosecution returned to the same theme:

“You know, how dare this guy complain about his rights? What about the rights of Mr. Thomas? Never mentioned anything about those rights. Unfortunately for Gary Thomas, this guy and his partner over here, Bernard Williams, were his judge, his jury, and his executioner. Now this guy, without presenting any evidence, wants to complain through his lawyer standing at a podium about his rights.”

Defense counsel objected, and the court instructed the jury, “The defendant does not have to take the stand in his own defense.” The judge did not rule on the defense objection, and he did not instruct the jury to disregard the statement. The prosecutor then stated: “You know, it never ends. They have no defense.”

The prosecutor also commented on the manner in which defense counsel conducted the cross-examination of State witness Martin Nash.

“[D]o you think that was easy for Martin Nash to be pulled up here from the Department of Corrections and be asked questions by a bunch of lawyers only to have a professional criminal defense lawyer hired to represent one of the two people who almost killed you get up there and ridicule you and belittle you and then stand before a jury and call him a buffoon and a clown. Then we wonder why people don’t come forward.”

We begin our analysis by examining the admissibility of evidence concerning gang affiliation. The circuit court’s evidentiary rulings with respect to gang-related evidence are reviewed for abuse of discretion. 
People v. Villarreal
, 198 Ill. 2d 209, 232 (2001); 
People v. Gonzalez
, 142 Ill. 2d 481, 489-90 (1991). Such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. 
Villarreal
, 198 Ill. 2d at 232; 
People v. Johnson
, 159 Ill. 2d 97, 118 (1994). Evidence of gang membership is admissible only when there is sufficient proof that membership is related to the crime charged. 
People v. Smith
, 141 Ill. 2d 40, 58 (1990). Evidence of gang affiliation is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 
Villarreal
, 198 Ill. 2d at 232-33.

Although we see no overt indication in the record that the circuit court actually considered whether the probative value of this evidence substantially outweighed its prejudicial effect, we find that it does. First, as to relevance, Detective Kato testified regarding Johnson’s initial oral statement and stated that Johnson had referred to the dispute as one involving gang rivalry. Johnson had identified himself as a member of the Traveling Vice Lords street gang and had referred to Puff and “the Dog Pound” as the instigators of the prior incident of violence. Second, we believe the potential for prejudice was minimal in this instance. In fact, it would seem that evidence of the rival gang affiliations of Johnson and Nash would as likely work to Johnson’s benefit as his detriment, as this court’s recent decision in 
People v. Blue
, 205 Ill. 2d 1 (2001), demonstrates. In 
Blue
, this court held that the trial court had erred in precluding defense counsel from cross-examining State’s witnesses regarding their gang affiliation, and found that error was not harmless. This court acknowledged the obvious: there is a clear motive to lie when witnesses identifying a defendant are members of a rival gang. 
Blue
, 205 Ill. 2d at 15. Therefore, while the gang affiliations provided a motive for the shooting, they also provided a motive for Nash to lie about Johnson’s involvement. Thus, we find that the probative value of the evidence outweighed its prejudicial impact, and its admission was not error.

Moreover, we find no error in the admission of Kato’s testimony regarding Johnson’s “interview” at Chicago police headquarters and Kato’s confrontation of Johnson with the “results of his interview downtown.” In closing argument, the prosecutor reminded the jury that Johnson had asked to “go downtown” to “show” the officers. The prosecutor observed, “[H]e bombs that and he comes back in, he’s confronted with the results of his interview downtown.”

After considering our precedents on this point, we cannot say that the
 testimony
 adduced at trial clearly signaled the jury that Johnson had taken and failed a polygraph. In 
People v. Jefferson
, 184 Ill. 2d 486, 497 (1998), this court held that testimony from a witness, that an unspecified appointment had been made for defendant with “a technician,” was sufficiently vague and would not have led the jurors to any improper speculation that defendant had been scheduled to take a polygraph examination. There is no reference to a “technician” or “examiner” in this case, terms that 
might 
alert the jury that a testing device was employed in the interview. The absence of such terminology distinguishes this case from 
People v. Mason
, 274 Ill. App. 3d 715 (1995) (jury was informed that defendant had spoken with a “technician” or an “examiner”). We find that Kato’s testimony did not improperly apprise the jury that Johnson had taken and failed a polygraph.

The prosecutor’s comments in closing argument, when considered with Kato’s testimony, 
do
 suggest that Johnson had taken and failed a polygraph test. By stating that Johnson intended to “show” the officers something by participating in an interview elsewhere, the prosecutor suggested that Johnson could conclusively demonstrate his innocence to authorities merely by his participation in “the interview” and that his guilt or innocence could be objectively verified by “the interview” itself. The fact that the interview took place elsewhere suggested that it entailed something other than mere discussion with police officers; otherwise, there would have been no need for Johnson to go anywhere. By stating that Johnson had “bombed” the interview, the prosecutor used a term commonly associated with failure, particularly with failing a test.

However, even 
if
 the jury speculated at that point in the trial as to the prosecutor’s references, and the nature of the evidence upon which those references were based, the inference that Johnson had taken and failed a polygraph was, by that point in the proceedings, properly drawn and considered. Evidence that a polygraph exam had taken place could be properly considered because defense counsel had made the “reliability” of Johnson’s statement an issue in his opening remarks to the jury and, by the time of closing arguments, he had elicited testimony calling into question the circumstances of Johnson’s confession. Thus, the reliability of Johnson’s statement was an issue from the outset. Comments regarding the timing of Johnson’s confession soon after his “interview,” or polygraph if that is the characterization of the evidence one prefers, unequivocally 
became
 proper 
after
 Johnson raised the issue of reliability at trial, first through the opening comments of his counsel, and later by testimony. 
Cf.
 
People v. Jackson
, 202 Ill. 2d 361, 370-71 (2002) (improper polygraph evidence 
preceded 
its relevance for any limited purpose). As this court noted in 
Jefferson
, the Court of Appeals for the Seventh Circuit, in 
United States v. Kampiles
, 609 F.2d 1233 (7th Cir. 1979), upheld a trial judge’s ruling that if a defendant were to testify that his confession had been coerced, the prosecution could then introduce evidence showing that the defendant made the confession after he was told that he had failed a polygraph test. The 
Kampiles
 court explained, “It would have been unfair to allow defendant to present his account of his admissions *** without allowing the Government to demonstrate the extent to which failure of the polygraph precipitated the confession.” 
Kampiles
, 609 F.2d at 1244. As we observed in 
Jefferson
, although the general rule in Illinois is to preclude introduction of evidence regarding polygraph examinations and the results of those tests, evidence of this kind may become admissible when a defendant, during trial, offers an alternative explanation for the reasons that led to a confession. 
Jefferson
, 184 Ill. 2d at 492, 497.

We believe that the prosecutor’s argument in this respect was not improper, as Johnson’s subsequent introduction of evidence, making the circumstances of his confession an issue in the case, opened the door for a prosecutorial argument suggesting–without specifically stating–that Johnson had confessed after he failed a polygraph exam.

We now consider whether testimony regarding Johnson’s prior arrests and adjudications of delinquency–characterized at trial as “convictions”– was improperly admitted at trial. Johnson called Dr. Gutzmann as an expert witness at trial for the avowed purpose of challenging the “reliability” of his statement, though it appears that Gutzmann’s testimony often ranged beyond reliability and addressed matters bearing upon the voluntariness of Johnson’s statement. As noted in our recitation of facts, Gutzmann testified that she believed Johnson lacked the intelligence, experience, and ability to knowingly and intelligently waive his constitutional rights. She also stated her belief that he was more susceptible to suggestion than the average person.

Gutzmann acknowledged that a person with prior experience in the judicial system might have gained pertinent knowledge from that experience. She said she was aware that defendant had been previously arrested on more than one occasion and she assumed he had been given 
Miranda
 warnings. Gutzmann stated she would find it relevant if she had known that Johnson had been given 
Miranda 
warnings on three separate occasions, but it would not change her opinion because she believed a person’s familiarity with the criminal justice system does not necessarily guarantee that he understands his rights. In that respect, Gutzmann noted that it is the experience of giving up rights and actually suffering consequences as a result thereof that causes people to comprehend the significance of those rights.

The prosecutor then attempted to ask Gutzmann a series of questions in an apparent attempt to ascertain the extent of Gutzmann’s knowledge concerning Johnson’s experience with the criminal justice system and whether she had taken any such experience into account when reaching her opinion. The prosecutor first asked whether Gutzmann had “taken into account the defendant’s background that he had actually been convicted of two separate crimes in 1994.” Although defense counsel only asked for a sidebar in response to the question, the trial court sustained “the objection.” The prosecutor asked whether Gutzmann would consider it relevant if the defendant had previously spent time in the Department of Corrections. An objection was overruled, and the witness responded, “Well, it’s relevant but I wouldn’t know what to make of it.”

On redirect examination, defense counsel asked Gutzmann about the 
specific
 nature of Johnson’s previous charges: “Now you heard [the prosecutor] talk about 
Miranda 
warnings having been given in the past to Mr. DeAngelo Johnson. Had Mr. DeAngelo Johnson ever been charged with murder before in the past?” Gutzmann responded that he had not.

On re-cross-examination, the prosecutor then asked more pointed questions about Johnson’s prior experience, including whether his arrests in 1994 were for delivery of “narcotics,” whether he was “convicted” on those charges, and whether he had been appointed an attorney to represent him in the proceedings on those charges. Gutzmann responded either “Okay” or “All right” to the prosecutor’s questions. It is unclear from the cold record whether these responses were meant as affirmative responses to the questions asked–perhaps Gutzmann was verifying the accuracy of the information conveyed by the questions from memory or by referring to documents at her disposal–or whether she was acknowledging the information for purposes of some hypothetical question she anticipated; however, it 
appears 
by the actions of all involved that the parties and court took Gutzmann’s answers to be affirmative responses to the prosecutor’s questions.

In the appellate court, Johnson claimed that this evidence of his prior arrests and “convictions” denied him a fair trial. The appellate court found that defense counsel had “opened the evidentiary door” to questions about Johnson’s prior arrests, but the defense had not opened the door “to questions about Johnson’s 1994 and 1995 delinquency findings in the juvenile court.” 
Johnson
, 317 Ill. App. 3d at 674. We disagree. Johnson’s defense, as presented through Gutzmann’s testimony, made his experiences in the juvenile and criminal justice systems a proper area of inquiry.

 Evidence of other crimes is admissible if it is relevant to establish any fact material to the prosecution. 
People v. Cortes
, 181 Ill. 2d 249, 284 (1998). A defendant’s previous experience with the criminal justice system is a relevant factor in determining whether a defendant is aware of his rights (
People v. Johnson
, 183 Ill. 2d 176, 199 (1998)) and whether a statement was given voluntarily (
People v. Foster
, 168 Ill. 2d 465, 479 (1995)). Prior prosecutions are relevant (
People v. Oaks
, 169 Ill. 2d 409, 451 (1996), 
overruled on other grounds by In re G.O.
, 191 Ill. 2d 37 (2000)), as are prior convictions (
People v. Mahaffey
, 165 Ill. 2d 445, 463 (1995); see also 
People v. Smith
, 333 Ill. App. 3d 622, 630 (2002); 
People v. Marquez
, 324 Ill. App. 3d 711, 720 (2001)). It follows that such evidence is relevant to a determination of whether Johnson’s custodial statement was “reliable” or truthful, an inquiry closely related to the question of voluntariness. See generally 
Jefferson
, 184 Ill. 2d at 498 (voluntariness of a confession is to be determined by the judge alone; however, a defendant may still present evidence to the trier of fact challenging the statement’s reliability or truth). Indeed, the evidentiary line between voluntariness and reliability was often blurred in this case, which was, no doubt, the prosecutor’s concern when he moved 
in limine 
to bar such testimony, arguing, “We should not be relitigating the motion to suppress.”

While there is no question that Johnson had the right to adduce evidence bearing upon the reliability of his statement, the State had the right to respond with evidence of Johnson’s prior experience with the justice system, the relevance of which was implicitly acknowledged by Johnson’s own expert. Clearly, evidence of Johnson’s progression through the justice system on prior occasions to the point of adjudication was relevant to the issue Johnson’s attorney had placed before the jury. By reason of his prior adjudications of delinquency, Johnson experienced the consequences of choices he had made, he was undoubtedly apprised of basic rights at some point, and he was afforded an attorney who presumably counseled him in that regard as well. In our view, admission of this evidence was subject only to a determination that its probative value outweighed its prejudicial effect. 
Moss
, 205 Ill. 2d at 156. Although it is not apparent that the circuit court made such a determination, we believe the evidence unquestionably qualified for admission under the appropriate standard.

Although the appellate court found it significant that the parties erroneously referred to Johnson’s adjudications as “convictions,” we do not. The testimony in question was adduced to establish Johnson’s familiarity with the criminal justice system and to show that he had experienced the “consequences” of that system, something that Gutzmann had indicated was relevant to a defendant’s ability to understand the significance of his rights. For that purpose, the difference between adjudications and convictions is not particularly significant. In either situation, the consequences of the justice system are manifest to the person subject to the proceeding.

We next address the appellate court’s holding that various comments of the prosecutor in closing argument were improper.

At one point in his argument, the prosecutor referred to defense counsel as “a professional criminal defense lawyer.” The appellate court held that reference was improper. Again, we disagree. In support of its holding, the appellate court cited 
People v. Hawkins
, 284 Ill. App. 3d 1011, 1016 (1996), wherein the appellate court held that a prosecutor’s reference to defense counsel as a “paid advocate” was improper. The 
Hawkins 
court relied upon cases that held it improper to refer to a defense attorney as a “hired gun.” See 
People v. Everette
, 220 Ill. App. 3d 453, 458 (1991); 
People v. Shaw
, 98 Ill. App. 3d 682, 685 (1981). According to the 
Hawkins 
court, “The term ‘paid advocate,’ while slightly less pejorative than the term ‘hired gun,’ nevertheless denigrates the assistance of counsel to which the accused is constitutionally entitled and thus falls within the scope of 
Everette
 and
 Shaw
.” 
Hawkins
, 284 Ill. App. 3d at 1016.

We express no opinion regarding the reasoning or holding of 
Hawkins
; however, we will not extend its holding to this case. We agree that it is error to refer to defense counsel as a “hired gun,” as the term and its connotations are in fact more pejorative. Moreover, we note that the prosecutor’s use of the term “hired gun” in 
Shaw 
was coupled with the accusation “ ‘they’re paid to do a job to mislead you, to confuse you.’ ” 
Shaw
, 98 Ill. App. 3d at 685. The use of the term in 
Everette
 was in the context of an argument which suggested that defense counsel approached the trial process as “ ‘some kind of a card game.’ ” 
Everette
, 220 Ill. App. 3d at 458. These elements are not present in this case. The remarks in this case do not suggest deception or trickery on the part of defense counsel, a factor which is dominant in the cases we have found on this point. Frankly, defense counsel 
was
 “a professional criminal defense attorney,” just as the attorney for the State was a professional prosecutor. The jurors are not so naive that they fail to recognize these distinctions, and we do not believe that these comments, without more, warrant the label of “error.”

The appellate court also found that the prosecutor improperly commented on Johnson’s right not to testify when he told the jury, “There is absolutely no evidence before you to attack the validity of [Johnson’s inculpatory] statement. Nothing. It is uncontested. *** There is no evidence to contradict the validity of the statement.” It is not entirely clear what the prosecutor meant by the “validity” of the statement. If by “validity” he meant to comment on the “voluntariness” of the statement, or point out that it was uncontested that a statement was made, or even that there was no evidence the statement was untruthful or unreliable, his comment was not improper. Johnson’s statement had been determined to be voluntary and it was properly before the jury. While Johnson was still entitled to present evidence to the trier of fact challenging the statement’s reliability or truth, and the jury was entitled to consider any such evidence as it bore upon the credibility or the weight to be given to the confession (see 
Jefferson
, 184 Ill. 2d at 498), much of Gutzmann’s testimony focused on her opinion that Johnson was incapable of knowingly and understandingly waiving his 
Miranda 
rights, matters pertinent to voluntariness. Moreover, to the extent that Gutzmann’s testimony insinuated that the 
content
 of Johnson’s statement may have been the product of police suggestion or overreaching, the result of a dependent personality influenced by those in authoritative positions, that testimony too was the proper subject of comment. Indeed, the jury heard testimony that suggested Johnson may not have understood his rights and thus may not have knowingly and intelligently waived them with a full appreciation of the consequences; however, the jury heard no testimony that explicitly challenged the truth or reliability of Johnson’s statement, or the “validity” of the statement, if that is the way one chooses to refer to it.

When determining whether the accused’s right not to testify has been violated, a reviewing court must examine the challenged prosecutorial comments in the context of the entire proceeding. 
Keene
, 169 Ill. 2d at 21; 
People v. Arman
, 131 Ill. 2d 115, 126 (1989). As this court stated in 
Keene
:

“[T]he State may comment that evidence is uncontradicted and may do so even if the defendant was the only person who could have provided contrary proof. [Citation.] To put it differently, the State is free to point out what evidence was uncontradicted so long as it expresses no thought about who specifically–meaning the defendant–could have done the contradicting.” 
Keene
, 169 Ill. 2d at 21.

Whether the prosecutor’s comments are construed as references to reliability or voluntariness, the prosecutor in this case stayed within the boundaries of proper argument. See 
People v. Williams
, 38 Ill. 2d 115, 125 (1967) (it is proper for the prosecutor to say defendant’s confession was “obviously voluntary” where the trial court had so ruled prior to trial). We find that the comments were proper.

In our opinion, the prosecutor barely crossed the line of propriety when, referring to Johnson in rebuttal argument, he stated, “[H]ow dare this guy complain about his rights? *** Now this guy, without presenting any evidence, wants to complain through his lawyer standing at a podium about his rights.” In response to a defense objection, the court instructed the jury, “The Defendant does not have to take the stand in his own defense.” However, the judge did not rule on the defense objection, nor did he instruct the jury to disregard the statement. The prosecutor continued, “You know, it never ends. They have no defense.”

A prosecutor may respond to comments made by defense counsel in closing argument that clearly invite a response. 
People v. Munson
, 206 Ill. 2d ___, ___ (2002); 
Kliner
, 185 Ill. 2d at 154. Such comments must be considered in the proper context by examining the entire closing argument of the parties. 
Kliner
, 185 Ill. 2d at 154; see 
People v. Mendez
, 318 Ill. App. 3d 1145, 1152 (2001).

During his closing argument, defense counsel repeatedly misstated the law and the evidence, and argued inferences which were not premised upon any evidence before the jury. We provide a few examples to illustrate the nature and tone of defense counsel’s closing argument.

Defense counsel argued that Johnson had “a reading score of 4.3. Uncontradicted.” The trial court sustained an objection to that statement, presumably because it was contrary to the evidence before the court. Defense counsel immediately reiterated that statement in service of an argument that intensive police interrogation had produced Johnson’s statement:

“They knew they would never convict [defendant] based upon the testimony of Mr. Nash. This is about a confession. That’s all this case is about. It’s not about evidence. It’s about a confession.

* * *

You know what the force of interrogations are like. You have seen it in this courtroom. Who can stand that pressure? They wanted to get a statement out of him, whether he is retarded or whatever. That’s what 
Miranda 
is about. Psychological coercion.”

The prosecutor objected that there was “no evidence there was any psychological coercion.” The trial court sustained the objection.

Defense counsel then embarked upon an argument suggesting that Johnson’s statement to authorities had been altered. After repeated objections by the prosecutor that there had been no testimony or evidence to that effect, the trial court eventually advised defense counsel that he was required to argue from the evidence presented at trial. Defense counsel replied, apparently seeking clarification, “I can argue from the document.” The court responded, “The document may be argued. There is no testimony regarding that. Counsel may argue.”

Continuing with an argument laden with innuendo and founded upon little or no evidence, defense counsel stated:

“Think about the testimony of Mr. Nash. The fact that nothing corroborates what was in his statement.

* * *

Look at [defendant’s] statement, because this is made on facts, not on emotion. Doesn’t mean anything to run up to him and call him all kinds of names and do all those kinds of things that call him the scum of the earth.”

The prosecutor objected, noting that “no one called him the scum of the earth.” The objection was sustained. Undaunted, defense counsel asked the jurors if they believed Johnson had gone to the police station “voluntarily” to participate in the investigative process. The prosecutor again objected and, when asked his basis, he responded, appropriately, “There is no evidence otherwise.” The trial court allowed defense counsel to continue with his line of argument.

Defense counsel concluded his argument by returning to his earlier theme that the police had not done enough to corroborate the facts included in Johnson’s statement, suggesting they were under a legal obligation to do so:

“Did they do anything to corroborate anything in this statement? Nothing. If you believe they didn’t do anything to corroborate, and it’s reasonable for them to do it and they didn’t do it, then they have not proven him guilty.”

Responding to the State’s ensuing objection, the trial court advised the jury, “That’s counsel’s argument. That is not the law.”

It was in response to these arguments that the prosecutor made the final comments of which Johnson complains. Defense counsel’s argument clearly invited appropriate State comments on many levels. However, while we can appreciate the prosecutor’s frustration with defense counsel’s conduct during closing argument, and indeed the presentation and theory of Johnson’s defense, we believe the circumstances called for a more measured response. It would have been enough to simply point out that there was neither evidence of coercion, nor testimony that Johnson’s rights had been violated in any way. Defense counsel’s argument did not grant the prosecutor a license to say anything he desired. The comments suggesting that Johnson was required to “present evidence” were improper, notwithstanding defense counsel’s comments.

Nevertheless, even though the prosecutor’s comment exceeded the bounds of proper argument, the verdict will not be disturbed unless the remark caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant’s right to a fair and impartial trial. 
People v. Williams
, 192 Ill. 2d 548, 573 (2000), quoting 
Kliner
, 185 Ill. 2d at 152. Applying these criteria to the facts of this case, we find that the prosecutor’s remark did not result in substantial prejudice to defendant and was not a material factor in his conviction.

Defense counsel repeatedly suggested in his closing argument that there was coercion in the procurement of Johnson’s confession even though the State’s evidence did not so indicate and there was no testimony presented by the defense to that effect. It is improper to argue assumptions or facts not based upon the evidence in the record. 
Kliner
, 185 Ill. 2d at 151. We expect defense attorneys to adhere to the same rules we apply to prosecutors. Johnson had not sustained his burden during the pretrial suppression hearing of showing that his statement was involuntary and much of defense counsel’s closing argument appears to have been–as the prosecutor predicted–an attempt to relitigate that issue before the jury. Under the circumstances, we find the impropriety of the prosecutor’s comment was marginal.

Moreover, when the prosecutor made the remark, the trial judge immediately advised the jury that defendant was not required to take the stand in his own defense. Subsequently, the jury was properly instructed pursuant to Illinois Pattern Jury Instructions, Criminal, No. 2.03 (3d ed. 1992):

“The Defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The Defendant is not required to prove his innocence.”

The jury was also instructed: “The fact that the Defendant did not testify must not be considered by you in any way in arriving at your verdict.” As this court has frequently stated, the prompt sustaining of an objection combined with a proper jury instruction usually is sufficient to cure any prejudice arising from an improper closing argument. 
People v. Nielson
, 187 Ill. 2d 271, 297 (1999);
 People v. Childress
, 158 Ill. 2d 275, 298 (1994). Although the trial court did not 
sustain 
defense counsel’s objection, the court immediately and unequivocally advised the jury that defendant was not required to take the stand in his own defense. That admonition, together with subsequent instructions given the jury, sufficed to cure any error associated with the prosecutor’s comments, which were brief and isolated. See 
People v. Simms
, 192 Ill. 2d 348, 396-98 (2000);
 Nielson
, 187 Ill. 2d at 298; 
People v. Lawler
, 142 Ill. 2d 548, 564-65 (1991). Given the content and context of the comments, and their relationship to the evidence, the prosecutor’s comments did not deny Johnson a fair trial.

We note that the evidence in this case was not closely balanced. The jury had before it Johnson’s confession, physical evidence corroborating the statement Johnson made to Detective Vucko in the nine-millimeter shell casings and bullets recovered after the shooting, and the uncontradicted testimony of an eyewitness to the shooting. Nash’s version of the shooting was consistent with what Johnson told police regarding his participation in the shooting. Moreover, Nash’s identification of Johnson as one of the two shooters was not contradicted by either positive testimony or by circumstances.

In sum, the prosecutor’s comments, quite simply, did not result in substantial prejudice to Johnson under these circumstances, and thus, they do not warrant reversal of Johnson’s convictions. As there was neither cumulative error, nor a pervasive pattern of prosecutorial misconduct and related trial error, the appellate court’s reliance upon 
Blue 
was misplaced. We reverse the judgment of the appellate court in cause No. 90678 and remand the cause to the appellate court with directions that the appellate court address defendant’s argument concerning ineffective assistance of trial counsel.

We note that our decision in 
Blue 
does not furnish a license to courts of review to adopt a cursory or skeletal analysis of the facts and issues before them. It 
does 
signal our intolerance of pervasive prosecutorial misconduct that deliberately undermines the process by which we determine a defendant’s guilt or innocence.

No. 90678
–
Appellate court judgment reversed;

 cause remanded with directions.

No. 90693
–
Appellate court judgment affirmed.

No. 90706–Appellate court judgment affirmed.