2020 IL App (1st) 172477-U

No. 1-17-2477

Order filed December 3, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 7807 |
| | ) | |
| ALEC FOY, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Hall and Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction and sentence for first degree murder, over his contentions that (1) the State's misconduct during closing arguments deprived him of a fair trial, and (2) his sentence was excessive.

¶ 2    Following a jury trial, defendant Alec Foy was found guilty of first degree murder (725 ILCS 5/9-1(a) (West 2012)) and sentenced to 50 years' imprisonment, which included a 25-year enhancement based on his personal discharge of the firearm which caused the victim's death. On

appeal, defendant contends (1) the State engaged in prosecutorial misconduct during its closing and rebuttal arguments; and (2) his sentence was excessive. We affirm.

¶ 3    The State charged defendant with first degree murder, alleging that, on December 23, 2013, he shot and killed Kenneth Miller. Prior to trial, defendant notified the State he would present the affirmative defense of self-defense. The matter proceeded to a jury trial, and the following evidence was presented.

¶ 4    Tammy Campbell testified that she was engaged to be married to Miller and that defendant was her uncle.[1] In December 2013, her mother, Amille Windbush, passed away. Her family delayed Windbush's funeral for approximately two weeks, until December 23, 2013, in order for the family to raise some money to cover the expenses. After the funeral, there was a repast at Windbush's home in Dixmoor.

¶ 5    At the repast, Miller helped serve guests, drank alcohol, and socialized. Around 5 p.m., the guests at the repast decided to go to a nearby bar. Tammy walked toward the door to leave. She saw Aunt Mae and they spoke briefly about her niece, Jordan.[2]

¶ 6    Tammy walked outside and met Miller and Latoya Broom near her vehicle. Miller said that he left his phone inside the house and he returned to retrieve it. When Miller did not come back immediately, she told Broom to go inside and get him. Tammy heard a gunshot inside the house. She left the keys in her vehicle, ran inside, and "slid" toward the kitchen. She noticed defendant walking toward the door and heard him say, "you don't know my life." Other guests stopped Tammy from entering the kitchen so she would not be able to observe what was transpiring. An

---

[1] Campbell's first name is spelled both "Tammy" and "Tammie" in the record. Additionally, we note that, because several witnesses share last names, we will refer to those witnesses by their first names.

[2] Aunt Mae's last name is not identified in the record.

ambulance eventually arrived, and Tammy followed it to the hospital, where she learned Miller had died.

¶ 7    On cross-examination, Tammy testified she did not know whether defendant contributed money toward the funeral costs. She denied seeing Aunt Mae having a conversation with Miller. She denied seeing Miller and defendant engaged in a heated conversation in the kitchen. During the repast, Tammy did not see either defendant or Miller with a weapon. She explained that she would have felt "anything that [Miller] had on him" because he had been hugging her throughout the day.

¶ 8    Ashton Eady testified she was outside with Tammy, Miller, Broom, and her Uncle Eric as they prepared to leave for the bar.[3] Miller went back inside the house to get his phone, and Eady went with him because she had to use the restroom, which was located near the kitchen. As someone was using the restroom, Eady waited in the kitchen. As she waited, Miller stood in front of the sink and neither defendant nor Miller were yelling. Eady went into the restroom and was unable to hear what was transpiring in the kitchen but, when she walked out, she saw defendant standing face to face with Miller, approximately three feet away from him. According to Eady, Miller and defendant were not yelling at each other, and she did not see either man with a handgun.

¶ 9    Eady walked toward the pantry, took a drink, and then heard two gunshots. She did not see who fired the two shots but, when she looked up, she saw defendant standing in front of Miller with a gun. "Maybe two" seconds after the first two shots, Eady saw defendant fire a third shot at Miller as he was falling to the floor and a fourth shot as he was on the floor. According to Eady, defendant shot Miller for no reason of which she was aware. Eady did not see Miller with a firearm.

_____

[3] Uncle Eric's last name is not identified in the record.

¶ 10    After the shooting, defendant walked out of the house and Eady remained in the kitchen where she administered cardiopulmonary resuscitation (CPR) to Miller, who was bleeding on the floor. An ambulance arrived and emergency medical technicians (EMTs) removed Miller from the house.

¶ 11    Eady was taken to the Dixmoor police department, where she gave a statement. She did not tell the police she saw defendant shoot Miller. She explained that she did not do so, as she was scared, nervous, and "ready to get back home" to her baby. She did not inform the police or the State's Attorney's office that she had seen the shooting until after the State had commenced its trial preparation in 2016. She explained the reason she spoke at that time was because defendant was in custody and she was no longer afraid.

¶ 12    On cross-examination, she testified she knew defendant was in custody in December 2013 but did not contact the police or the State's Attorney's office until 2016. Though she was not related to defendant, she told the State she was related to Tammy and that she did not "want to tell on [defendant]." She denied telling the State she was related to defendant but was impeached with a written statement in which she indicated defendant was her relative. She explained that, though she reviewed and signed the statement after it was written, she did not see the part stating she was related to defendant. At all times, she told police she was related to Tammy, not defendant.

¶ 13    Latoya Broom testified that she was outside with Tammy and Miller waiting to go to the bar. Miller went inside to get his phone and, because he "was taking too long to leave," she went inside to get him. When Broom went inside, she saw defendant standing face to face with Miller. She did not see a weapon in Miller's hands and was unable to see defendant's hands. Broom did not see Miller threaten or strike defendant.

¶ 14   Broom heard two gunshots coming from the kitchen. She stood against the wall and heard two more gunshots. She went inside a bedroom and closed the door. Broom heard Tammy come inside screaming. Broom opened the door and went with Tammy to the kitchen. Defendant passed them, saying "[l]et the EMT worry about it," and walked out the front door.

¶ 15   Before the shooting, Broom saw Aunt Mae confront Miller with a raised voice. Miller did not appear upset but rather was "just standing there." After Aunt Mae confronted Miller, defendant, and Miller "had words."

¶ 16   Broom called 911 and saw Miller bleeding on the floor as two people administered CPR to him. The paramedics arrived and administered aid to Miller. By that time, defendant was gone. Broom did not see Miller with a weapon at any time.

¶ 17   Shelley Jordan testified that, around 4:30 p.m., she spoke with defendant between the dining room and kitchen. At some point, they began discussing guns. Defendant stated, "I keep mine" and showed Shelley the handle of his gun, which he referred to as a "banger." Shelley told defendant she did not like guns and ended the conversation. Within five minutes of ending her conversation with defendant, Shelley planned to go outside to smoke a cigarette but heard four or five gunshots before reaching the door. She turned around, walked to the kitchen, and saw Miller lying on the floor bleeding. She then "ran out [of] the house screaming and hollering." Shelley did not see defendant again.

¶ 18   Shelley never saw Miller with a weapon or a gun. She never saw Miller make inappropriate contact with any family member. Miller was quiet, humble, and helpful throughout the day, and Shelley did not see him angry with, yelling at, or being aggressive toward anyone.

¶ 19    On cross-examination, Shelley testified she did not hear Aunt Mae "having words with" Miller or accusing him of anything. Shelley spoke with a police officer after the shooting but did not recall telling the officer she overheard a conversation in the next room. Shelley did not see Miller inappropriately touch an eight-year-old child or have a conversation with the child's mother.

¶ 20    Trey Jordan testified that, at the repast, the guests were talking, drinking alcohol, and eating. During the repast, he and defendant spoke about boxing, and Trey offered to box with defendant. Defendant told Trey "I got something for you" and flashed the handle of a gun from his pocket. Defendant then said "I have something that will put you down." Trey felt uncomfortable, "laughed it off," and walked out of the house.

¶ 21    During the repast, Trey observed Miller pick up Jordan, Trey's eight-year-old cousin, give her a hug, and a kiss on the cheek. Trey did not see Miller with a gun or weapon at any time during the repast. Trey observed his Aunt Mae, who was visibly upset, speaking with Miller. After the conversation, Miller appeared bothered and upset. Trey denied seeing defendant and Miller arguing at the repast and left before the shooting occurred.

¶ 22    Johnathan Campbell testified that Miller greeted Jordan at the repast by picking her up, hugging her, and kissing her cheek. Jordan did not do anything unusual when Miller picked her up. At no point during the repast did Johnathan see defendant or Miller with a gun.

¶ 23    At some point, Miller and Tammy were outside, getting ready to go to a bar. Miller came back inside and walked to the kitchen. Johnathan looked into the kitchen and saw defendant and Miller, standing "chest to chest," arguing loudly over "the situation with Jordan." Johnathan did not observe any objects in either defendant's or Miller's hands. Defendant's mother came into the kitchen, calmed both defendant and Miller down, and left.

¶ 24　As Johnathan continued a conversation with a family member, he heard two gunshots, and saw a flash out of the corner of his eye. He "grabbed all the kids," ran into a bedroom, and heard another shot. Johnathan opened the door to the bedroom about 10 seconds later and saw defendant walking out of the house, angrily saying "I don't need this s***" and "you don't know my lifestyle." Johnathan ran to the window and saw defendant with his hands on top of his head, holding a dark revolver with a wooden handle. Johnathan tried to see what had happened, but guests stopped him and pulled him back into the bedroom.

¶ 25　After the shooting, Johnathan spoke to the police with his mother, Tammy, present and gave a statement. Before he answered any questions, he asked Tammy whether he should tell the truth or "the version that the family told [him] to tell." According to Johnathan, defendant's mother told him to keep quiet and tell police that he did not see anything. Tammy told Johnathan to tell the truth, which is that he did not see defendant shoot Miller, know what started the fight, or know whether Miller had a gun.

¶ 26　Dr. Steven White, an assistant medical examiner, was qualified as an expert in forensic pathology. He testified that he performed an autopsy and, as part of his examination, determined that Miller was 5 feet, 10 inches tall. White observed that Miller had been shot four times, once in the face, chest, the back of the upper-left arm, and upper-left side of his back. Two of the gunshot wounds had corresponding exit wounds. According to White, none of the shots were fired at close range but rather from a range of at least two to three feet away. He was unable to determine the order in which the shots were fired. Photographs of the wounds were admitted into evidence and published to the jury.

¶ 27     One of the entrance wounds was on the left side of Miller's face, just over the jaw. White determined that the bullet corresponding to that wound fractured Miller's jaw bone, "went down into the neck," where it injured his carotid artery and jugular vein, hit his spine, and became lodged in his back. White described the bullet's path as a "downward." Based on the path of the bullet, White opined that the gun would have been above Miller's body to take such a path. The downward path could also have been the result of the shooter being taller than Miller. White could not determine whether Miller was standing or in some other position when the shot was fired.

¶ 28     White testified that another bullet entered Miller's upper-right chest, went through Miller's right lung and chest wall, and exited the right side of Miller's upper back. White described the path of the bullet as "front to back *** left to right." Based on the course of the bullet, the shooter would have been standing "a little bit to [Miller's] left."

¶ 29     With respect to the wounds on Miller's left arm and left upper back, White described the course of the bullets as "left to right." One of the wounds had an associated exit wound, and one did not. Because the wounds were in close proximity, White was unable to determine which of the wounds was associated with the exit wound. Asked whether, based on the course of the wounds, Miller would have been facing the gun, White replied "He would not have been facing the gun. It would either have to be from the back or the left side." White later clarified that the shots causing those wounds would have been fired "more from the left side, the left slightly back" because there was not a direct back-to-front trajectory.

¶ 30     White also testified that, as part of the autopsy, he performed a toxicology analysis on Miller and determined that, at the time of the shooting, Miller's blood-alcohol level was in excess

of the legal limit for driving. White opined, based on his examination, that Miller died from multiple gunshot wounds and the manner of death was homicide.

¶ 31    Sergeant Shaun Grosvenor, a crime scene technician, testified he processed the scene of the murder. Other than a bullet fragment on which there were blood-like stains, he did not recover any firearm evidence. After he processed the scene, he took custody of the bullet which was recovered from Miller's clothing by a paramedic. Grosvenor was present for Miller's autopsy and took custody of two bullets that were recovered from Miller's body.

¶ 32    The State presented a stipulation that, if called to testify, Jeffrey Parise would be qualified as an expert in ballistics and firearm identification. He determined that three of the bullets recovered by police were fired from the same firearm and a fourth was not suitable for comparison.

¶ 33    Officer Jonathan Weaver testified that, on December 31, 2013, he was working for the Madison police department in Wisconsin. He received information that defendant was wanted on a felony warrant for a murder in Cook County, and purportedly lived at an apartment in Madison. Weaver and other officers went to the apartment and made contact with defendant. Defendant exited the apartment, and the officers detained him. Weaver asked defendant whether he had any weapons, and defendant replied, "I tossed it outside of where it happened" in Illinois. While defendant was being taken into custody, he asked "what took you guys so long?"

¶ 34    Defendant was taken to the Dane County jail where, while being processed, he told Weaver he was 5 feet, 11 inches tall and weighed 180 pounds, which according to Weaver, was "approximately accurate." Defendant made several spontaneous statements to Weaver, including the following: (1) "he should have went with his first instinct and not went to the funeral"; (2) "the stupid s*** I do for my family"; (3) "this [was] the dumbest situation that I had ever gotten myself

into"; (4) he had "just one of those black out moments and all this happened"; and (5) the day in question "was a bad day" and that "his mom was going to be sad because she had lost her daughter and her son all on the same day." Defendant also stated he "wouldn't let Dixmoor [police] catch me just out of principal [*sic*]," and, while laughing, continued, "s***, they drove right by me. I mean, why wouldn't you stop a guy walking away who matches the description."

¶ 35    The State rested, and defendant moved for a directed verdict. The court denied the motion.

¶ 36    Defendant testified that, in December 2013, he lived in Madison, Wisconsin, with his fiancée and son. Defendant rode to Windbush's funeral with his cousin. Defendant had contributed "a couple hundred dollars" to cover the cost of Windbush's funeral and, in an effort to raise more money, he tried to sell his revolver. When pressed for details on cross-examination on his efforts to raise additional money for the funeral, defendant testified he brought $500 with him to the funeral and contributed $200 toward the funeral, keeping the rest to cover his rent. When he arrived at the funeral home, he learned his mother had borrowed additional money to cover the funeral costs, so he intended to sell his gun for $200 and give the proceeds to his mother. He did not try to sell the gun in Wisconsin before he left for the funeral. Even though defendant intended to sell the gun, he kept it loaded when he travelled to and while at the funeral. Asked when he knew his mother needed additional money, either before he left or at the funeral home, defendant explained his family had posted on the internet that it was raising money for the funeral.

¶ 37    Outside the funeral, defendant spoke with Miller and asked whether he wanted to buy his gun. Miller replied, "naw'l, [I] got one," and patted his right side with his hand.

¶ 38    Defendant drank vodka at the repast but was not "too drunk." At some point, he observed his mother and Aunt Mae having a conversation with Miller, in which they told him to leave the

repast because he had allegedly inappropriately touched Jordan. Miller was speaking loudly and was making hand gestures. Defendant approached Miller, asked him to "bring down his tone," and told him to get his hand out of his mother's face. Defendant asked Miller to leave, and Miller responded with a smirk, saying "he wasn't going nowhere but to the bathroom." Defendant told Miller he could use the bathroom but then had to leave.

¶ 39    Defendant left the kitchen briefly, and then returned and continued the conversation with Miller. As defendant and Miller stood three to four feet apart, defendant asked Miller to leave the house, and Miller responded that he was "not going any f***ing where." Defendant again told Miller to leave, and Miller responded, "I'm going to kill you, you police calling ass b***." Miller then reached toward his right side, which Miller had patted at the funeral, causing defendant to think Miller was going to pull a gun and shoot him.

¶ 40    Defendant reached into his pocket, grabbed his gun, and fired at Miller, hitting him in the arm. Miller grabbed his arm and said, "[y]ou shot me," to which defendant replied, "[y]eah, you reached." Miller said, "I am going to kill you for this. This ain't over." Defendant asked Miller to leave again, and Miller started to walk toward the door but "dropped his arm down." Defendant told Miller to keep his hands where he could see them, and Miller "turned like he was reaching and turned toward [defendant]," and defendant fired another shot, hitting Miller in the chest. Miller reached out "like he was trying to grab [defendant] or rush toward [him]," and defendant, who was "still scared," stepped back and fired a third shot, hitting Miller in the face.

¶ 41    After the third shot, Miller fell forward to the ground. Defendant stepped to Miller's side, bent down to check his pulse, but could not feel it because his hands were trembling. Defendant stood up, took a CPR mask out of his wallet, and squatted back down. Defendant tried to roll Miller

over to begin giving aid to him, and Miller's body "jumped." Defendant "jumped back" and the gun accidentally fired.

¶ 42    Defendant realized he "was not in a position to even try CPR" and directed other guests to call 911. He walked out of the house and paced on the sidewalk with his hands on his head and the gun in his pocket. He waited for the police "for a second," but panicked at the thought of being unable to see his son again and left for Wisconsin in Tammy's vehicle. On his way back to Wisconsin, defendant threw his gun out the window.

¶ 43    When defendant returned to Madison, his son was not there because his fiancée had taken him to visit family in Indiana. Defendant called his fiancée to tell her to come back to Wisconsin so he could see his son before he turned himself in. He did not know whether Miller was dead and, though he believed Miller to be a "good friend," he did not call anyone to determine whether he survived. He explained, on cross-examination, he had no means of contacting his family because his mother did not have a phone and he did not have other family members' phone numbers.

¶ 44    The Madison police department came to his house three or four days later and told him "they had an alert on [him]." At the time, defendant was scared, "jabbering a lot," and "making small conversation."

¶ 45    On cross-examination, defendant testified he acquired the gun for protection and carried it with him everywhere while he was homeless. After he obtained housing, defendant kept the gun in a gun box in his home. When asked whether he "always carr[ied] around a loaded gun," defendant replied, "[y]es." However, on other occasions throughout cross-examination, defendant denied that he carried the gun with him or wanted it on him at all times.

¶ 46    Defendant never saw Miller with a gun but, based on Miller's statement to him, defendant believed Miller had one. When Miller patted his right side, defendant did not see a "bulge," explaining Miller had on a baggy sweater.

¶ 47    Defendant denied telling Shelley that he always kept "a banger," or gun, in his pocket. Defendant denied saying, "[l]et the EMTs take care of it," and "[y]ou don't know my life," as he walked out of the house after the shooting. Rather, he said, "[c]all the EMTs so they can help him." He also denied telling Weaver that he "had one of those blackout moments [when] this happened."

¶ 48    According to defendant, he fired the first shot at a distance of three to four feet, and the shot struck Miller in his left arm as Miller was facing toward him. When confronted with White's testimony that there was no wound found on Miller's arm, defendant explained that he could not say exactly where the first shot hit Miller, but stated Miller grabbed his arm, so he assumed the shot hit his arm. He later admitted the first shot hit Miller in the chest. Miller did not "wobble" or fall after the first shot.

¶ 49    Defendant stopped shooting after the first shot and fired a second time when Miller "attempted to reach again." Defendant testified the second shot also hit Miller in his chest. When confronted with White's testimony that the only wounds on the front of Miller's body were on his chest and face, defendant testified he was unsure where the second shot hit Miller. He later testified the third shot hit Miller in the face, as Miller "was reaching forward." After Miller was hit in the face, he fell face first toward the ground. On redirect, defendant testified he fired the second shot as Miller turned toward him and, at that time, he was to Miller's left side.

¶ 50    Defendant also presented a stipulation, which established that, in October 2006, Miller "pled guilty to aggravated vehicular hijacking with a firearm, that firearm being a gun."

¶ 51    In closing, the State argued, in part, that the evidence did not support a finding that defendant acted in self defense, especially where he shot Miller four times, including twice in the back. Additionally, the State noted defendant's account of the shooting conflicted with the medical examiner's testimony and that defendant's explanation for bringing his gun to the funeral did not make sense. Further, the State argued defendant's act of leaving the scene before police arrived was indicative of his guilt.

¶ 52    Defense counsel responded that defendant reasonably believed that Miller was armed and was going to shoot defendant if defendant did not act first. In doing so, counsel noted Miller had a prior conviction for aggravated vehicular hijacking with a firearm, which supported defendant's belief that Miller was armed on the day of the shooting. Additionally, counsel argued defendant's explanation for leaving the scene before police arrived was plausible and not indicative of his guilt, especially given defendant remained at his home in Wisconsin where police would know to find him.

¶ 53    In rebuttal, the State responded that Miller's prior conviction occurred seven years prior to the shooting, that Miller was a "young kid" at the time, and there was no evidence which showed Miller had a gun at the time of the shooting. The State also argued defendant fled from the scene after shooting Miller and that his actions were not those of an innocent man.

¶ 54    The jury found defendant guilty of first degree murder and found he personally discharged the firearm which caused Miller's death. Defendant filed a supplemented posttrial motion, which the court denied.

¶ 55    Defendant's presentence investigation report (PSI) was submitted to the trial court prior to sentencing. The PSI indicated defendant was born on January 28, 1983 and was 30 years old at the

time of the offense. It set forth defendant's criminal history, which included prior convictions for possession of a controlled substance, obstructing a police officer, possession of cannabis, driving on a suspended or revoked license, and disorderly conduct.

¶ 56    According to the PSI, defendant maintained a close relationship with Windbush until her death. He was expelled from high school during his senior year due to absenteeism but was an average student until that point, and he had no future educational plans. From May 2013 until his arrest for this offense, he was employed in Madison, first at an ice cream shop and then at a warehouse. Defendant could not recall any specific information relating to his employment prior to May 2013 and did not have any future employment plans. Defendant had two children, a 3-year-old son with his current girlfriend, and an 11-year-old son from a prior relationship. The PSI indicated defendant supported his girlfriend and 3-year-old son at the time of the offense but did not state whether he also supported his 11-year-old son.

¶ 57    Defendant had never been associated with a street gang. He reported he used alcohol socially but had never used illegal drugs. He was cooperative and forthcoming with the probation officer who prepared the PSI and had "pro-social relationships with his non-criminal family and friends."

¶ 58    At the sentencing hearing, the court received victim impact statements from Miller's mother and three sisters, all of which emphasized the significant impact that Miller's death had on their lives. The parties offered arguments in aggravation and mitigation, and defendant stated in allocution that he apologized to the Miller family, that he did not mean to harm anyone, that he acted in self defense, and that he was going to use his prison time to strengthen his mind, body, and soul.

¶ 59    In imposing sentence, the court stated it had considered the evidence presented at trial, the PSI, which included information about defendant's history and character, the arguments of the parties and defendant's statement in allocution, and "certain statutory matters, mostly those in aggravation and as well as mitigation." The court found that the sentence to be imposed was necessary to deter others from committing the same crime. The court noted there were mitigating factors in this case, including the fact defendant "had no prior violent history," and the cost of incarceration. The court indicated it had considered the "particular" and "unique" circumstances of the case, including that the murder occurred two days before Christmas, it occurred at a funeral, defendant had caused an additional, unnecessary loss, and defendant had fired four shots. The court sentenced defendant to 50 years' imprisonment, which included a 25-year enhancement based on his discharge of the firearm which caused Miller's death.

¶ 60    Defendant filed a motion to reconsider sentence, which the court denied. This appeal followed.

¶ 61    Defendant first contends he was denied a fair trial where the State engaged in prosecutorial misconduct during closing arguments. Specifically, he argues the State misrepresented the evidence, prejudicially misstated his testimony, and made disingenuous comments about Miller's law-abiding lifestyle, all of which prejudicially undercut his claim of self defense. He also argues that, even if none of the instances of prosecutorial misconduct by themselves warrant reversal, the cumulative effect of the misconduct deprived him of a fair trial.

¶ 62    Defendant acknowledges he forfeited review of the issue because, while he made contemporaneous objections to some of the State's comments of which he now complains, he failed to include the issue in his posttrial motion. See *People v. Naylor*, 229 Ill. 2d 584, 592 (2008)

(defendant forfeits review of error by failing to both contemporaneously object and include the issue in his posttrial motion). He nevertheless argues this court should review the issue under the plain error doctrine.

¶ 63    The plain error doctrine is a narrow and limited exception to the forfeiture rule, which permits a reviewing court to review unpreserved errors when a clear or obvious error occurs and (1) " 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' " or (2) " 'the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* at 593 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Defendant bears the burden of persuasion under both prongs of plain error analysis. *Naylor*, 239 Ill. 2d at 593. The first step of the analysis is to determine whether error occurred. *People v. Thompson*, 2015 IL App (1st) 122265, ¶ 34.

¶ 64    "Every defendant has the right to a trial free from improper prejudicial comments or arguments by the prosecutor." *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). When a defendant raises a claim of prosecutorial misconduct in closing argument, we consider the closing arguments of both the prosecutor and defense counsel in their entirety so the prosecutor's remarks are placed in context. *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009). A prosecutor is afforded wide latitude in making his or her closing argument, and he or she has the right to comment on the evidence and draw all legitimate inferences deductible therefrom, even if unfavorable to the defendant. *Pasch*, 152 Ill. 2d at 184. Additionally, "[a] prosecutor may respond to comments made by defense counsel in closing argument that clearly invite a response." *People v. Johnson*, 208 Ill. 2d 53, 113 (2003).

¶ 65    If a prosecutor's remarks exceed the bounds of proper argument, reversal is warranted only where the prosecutor's remarks result in substantial prejudice to the defendant. *Pasch*, 152 Ill. 2d at 185. "Substantial prejudice occurs 'if the improper remarks constituted a material factor in a defendant's conviction.' " *Phillips*, 392 Ill. App. 3d at 275 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)). We evaluate whether a prosecutor's comments or arguments constitute prejudicial error based on the language used, its relation to the evidence presented, and the effect of the argument on the defendant's right to a fair and impartial trial. *Pasch*, 152 Ill. 2d at 184.

¶ 66    Initially, we note the parties dispute the applicable standard of review. Defendant, citing *Wheeler*, 226 Ill. 2d at 121, contends that, because there is no dispute the State elicited the described testimony and made the described remarks in closing, this court is asked to settle a purely legal question, which should be reviewed *de novo*. The State maintains, as recognized by this court in *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82, the standard of review to be applied to claims of prosecutorial misconduct is an open question. Nevertheless, the State argues that, under either a *de novo* standard or an abuse-of-discretion standard, defendant's claims should be rejected. We agree with the State that we need not settle the question here because, under either standard, we find defendant's claim fails.

¶ 67    Defendant contends the State misrepresented the medical examiner's testimony in its closing arguments when it (1) argued the shot to Miller's face could only have happened if he was falling, (2) repeatedly stated that Miller was shot twice in the back, and (3) observed the first shot killed Miller. According to defendant, these comments, which were not supported by the medical examiner's testimony, "unfairly implied that [defendant] was not acting in self defense" and "unprovokedly attack[ed] Miller." We will address each remark in turn.

¶ 68    With respect to the State's argument in regard to the downward trajectory of the shot which hit Miller's face, defendant argues the remark was not supported by the evidence where the medical examiner's testimony left open the possibility that the shot could have been fired by a person taller than Miller or when Miller was lunging toward defendant.

¶ 69    After reviewing the State's argument in context, we find that the prosecutor's comment was a reasonable inference drawn from the evidence. In closing, the State commented on how defendant's testimony relating to how the shooting transpired conflicted with the physical evidence it had presented. Noting that defendant had admitted on cross-examination that the first shot could have hit Miller's chest, the State argued that Miller would not have been able to threaten defendant and reach for a gun as defendant had testified because the shot to the chest pierced Miller's lung. The State argued that, after being shot in the chest, Miller began to fall and that defendant shot him in the face at a "downward slope." Noting defendant was only one inch taller than Miller, it contended the downward trajectory of that shot "could only occur in one way[:] [t]he body falling." In rebuttal, the State again argued that the "only way" the shot to Miller's face could have had a downward trajectory is if Miller was falling when the shot was fired.

¶ 70    These comments did not misrepresent the medical examiner's testimony. Indeed, throughout its argument, the State never asserted the medical examiner testified the wound could only have taken the downward trajectory if Miller was falling when the shot was fired. Rather, the State drew a reasonable inference, based on the medical examiner's testimony, that Miller began to fall when the first shot pierced his lung and defendant fired a shot at Miller's face as Miller was falling to the ground. See *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 78 (finding the State drew a reasonable inference from the evidence presented at trial that a fingerprint was a "fresh

print" even though no witness testified that the fingerprint was fresh). Accordingly, we conclude this remark was proper argument.

¶ 71    With respect to the State's remarks that Miller was shot twice in the back, defendant argues the State repeatedly made this assertion when that was not the medical examiner's testimony. Rather, defendant observes, the medical examiner testified the shots were fired "more from the left side" and the shots did not take "a direct back to front trajectory."

¶ 72    In closing, the State argued, in relation to defendant's self-defense claim, that defendant's use of force was not justified. According to the State, none of its witnesses testified Miller was carrying a weapon or ever threatened defendant, and there was no evidence supporting his claim of self-defense other than his own self-serving testimony. Further, the State argued the four shots defendant fired at Miller were "overkill," noting defendant shot Miller, once in the chest, once in the face, once in the back, and once in the back of the arm. The State asked rhetorically, "how do you claim self[]defense when you shoot somebody four times, including twice in the back," when it "takes only one bullet to put somebody down." Later, the State twice repeated its assertion that defendant shot Miller twice in the back while arguing that defendant fabricated his story to fit his theory of self-defense.

¶ 73    After reviewing these comments in context, we conclude the State's argument was a reasonable inference based on the evidence presented at trial. The record shows the medical examiner's testimony, and the autopsy photographs establish that Miller had four gunshot wounds, including one on the back of his left arm and another on the upper-left side of his back. Admittedly, the medical examiner testified he concluded, based on the left-to-right trajectory of the shots which hit Miller's back, that the shots were fired "more from the left side, the left slightly back" because

there was not a direct back-to-front trajectory. However, he also testified Miller was not facing the gun when those shots struck him. Thus, while the medical examiner's testimony did not conclusively establish defendant shot Miller twice "in the back," the State's argument that defendant shot Miller in the back, insofar as it related to the issue of whether his use of force was justified, had a basis in the evidence and was not improper. *Pasch*, 152 Ill. 2d at 184 (State has wide latitude during closing argument and may comment on the evidence and draw all reasonable inferences in its favor).

¶ 74    Defendant next takes issue with the State's argument that the first shot killed Miller. In rebuttal, the State argued, "[w]hen [defendant] pulled out that gun, the first shot [Miller] was dead." According to defendant, the State's argument had no basis in the evidence where the medical examiner never testified the first shot killed Miller.

¶ 75    We agree with defendant that this argument had no basis in the evidence and was therefore improper. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60 ("it is improper for a prosecutor to argue inferences or facts not based upon the evidence in the record"). However, defense counsel objected to this remark, stating "that was not the testimony," and the trial court instructed the jury to "rely on your own recollection of the evidence." Additionally, at the conclusion of the case, the court instructed the jury that neither opening statements nor closing arguments are evidence, and that any statement or argument made by the attorneys which is not based on the evidence should be disregarded. Illinois Pattern Jury Instructions, Criminal, No. 1.03 (approved July 18, 2014) (hereinafter IPI Criminal No. 1.03). We find that the court's instruction to the jurors to rely on their recollection of the evidence was sufficient to cure the error. See *Moody*, 2016 IL App (1st) 130071, ¶ 60.

¶ 76    Defendant also argues the prosecutor prejudicially misstated his trial testimony and employed a "highly improper" tactic of attributing testimony to defendant that he did not give, including that "[he] got this gun[,] carr[ied] it everywhere[, and was] not letting go of [it]," and that "[he] ha[d] five handguns" and "gave two handguns to [his] mom." Defendant contends the State compounded this error in rebuttal, when it stated "[t]his guy is a murderer. Everybody knows he fled."

¶ 77    With respect to the State's remark that defendant told the jury "[he] got this gun[,] carr[ied] it everywhere[, and was] not letting go of it," defendant argues he maintained throughout his testimony, despite repeated attempts by the State to elicit evidence to the contrary, that he did not carry the weapon with him at all times.

¶ 78    We conclude the State's remarks were based on the evidence presented at trial and were, therefore, not improper. It is true, as defendant asserts, that he remained steadfast in his position that he did not carry his firearm daily despite repeated attempts by the State to elicit such testimony from him. However, defendant also testified that he carried the handgun on a daily basis for a period of time, including within a year of the shooting. Additionally, Shelley testified at trial that defendant showed her the gun at the repast, stating "I keep mine," and Trey testified that defendant showed Trey his gun and said "I got something for you." Given the State has wide latitude in making closing arguments and the statements were based on the evidence presented, we find that the State's remarks were not improper. See *Pasch*, 152 Ill. 2d at 184 (State has wide latitude during closing argument and may comment on the evidence and draw all reasonable inferences in its favor).

¶ 79    With respect to the State's argument that defendant "ha[d] five handguns" and "gave two handguns to my mom," we agree with the State that these remarks appear to be an inadvertent misstatement. The record shows the State made this comment while it was commenting on the contradictory nature of defendant's testimony relating to why he brought the handgun to the funeral and his attempt to sell the firearm to raise funds for his mother. Defendant testified that he had $500 and gave $200 to his mother to cover funeral costs and, when he got to the funeral, he learned his mother had borrowed money to cover additional costs. Thus, the State argued defendant had no reason to bring the gun to the funeral to sell it because he did not know more money was needed until he arrived at the funeral. When viewed in context, the record shows the prosecutor was likely recounting defendant's testimony that he had $500 and gave $200 to his mother but misspoke. We find this misstatement did not result in substantial prejudice to defendant, particularly where the trial court instructed the jury that closing arguments were not evidence and that it was to rely on its recollection of the evidence. See *Moody*, 2016 IL App (1st) 130071, ¶ 60; IPI Criminal No. 1.03.

¶ 80    With respect to the State's argument in rebuttal that defendant was "a murderer" and "[e]verybody kn[ew] he fled," defendant argues the remarks were prejudicial "because they falsely t[old] the jury that [defendant] admitted to fleeing due to guilt, when, in actuality, [he] maintained throughout his testimony that he only went back to Wisconsin to see his son."

¶ 81    We conclude the State's argument was both invited by defendant's argument and a fair inference drawn from the evidence. In closing, defense counsel argued defendant's actions after the shooting of driving back to Wisconsin and remaining at his apartment until his arrest were the actions of an innocent man who wished to see his son. Thus, defendant clearly invited the State's

response in rebuttal that his actions, including that of leaving the scene, failing to call his family to determine whether Miller had survived, and his postarrest statements and demeanor, were indicative of his guilt and not of someone who had acted in self-defense. See *Johnson*, 208 Ill. 2d at 113 (prosecution may respond to comments made by defense counsel in closing argument that clearly invite a response).

¶ 82    Further, the State did not, as defendant asserts, "falsely tell the jury that [defendant] admitted to fleeing due to guilt." Rather, the State drew a reasonable unfavorable inference from the evidence presented at trial that defendant fled because he murdered Miller. See *Pasch*, 152 Ill. 2d at 184. Moreover, we note defense counsel raised a contemporaneous objection to these remarks. The trial court sustained the objection as "to what everybody kn[ew]" and to "calling [defendant] a murderer." We find, by sustaining defendant's objection and, as noted above, instructing the jury at the close of the case that the jury was to rely on its recollection of the evidence, any implication that defendant admitted to fleeing was cured. See *Moody*, 2016 IL App (1st) 130071, ¶ 60.

¶ 83    Defendant next argues the prosecutor "disingenuously" commented on Miller's law-abiding lifestyle. Defendant asserts the State's theme throughout trial and closing argument was that Miller was an "upstanding citizen," as evidenced by the prosecutor's remark that he was "joyful, happy, greeting people [at the repast], [and] excited about his future." Defendant maintains the State downplayed Miller's prior conviction for aggravated vehicular hijacking with a firearm by passing it off as a youthful indiscretion, and argued seven years had passed since his conviction and that he had not carried a gun since his conviction. According to defendant, the State (1) improperly characterized Miller's prior conviction was for "carrying a gun"; and (2)

disingenuously implied he had stayed out of trouble and refrained from carrying a gun in the interim when, in fact, he was incarcerated for most of that time.

¶ 84    We conclude the State's remarks were invited by defense counsel's argument, were supported by the evidence, and did not improperly characterize Miller's prior conviction. As support for his claim of self-defense, defense counsel argued in closing that defendant feared for his life and reasonably believed Miller was carrying a gun when defendant shot him because Miller told defendant at the funeral that he had a gun and because Miller had previously been convicted of aggravated vehicular hijacking while armed with a firearm. According to counsel, Miller "like[d] to have his guns," had been "convicted of carrying a gun," and was not the "lovely, wholesome man" the State had portrayed him to be. Rather, he was "a person who would pull a gun out and take your car because he wants it." Counsel maintained defendant feared for his life because a man, who was known to "carry a gun," threatened to kill him.

¶ 85    First, we note the remarks of which defendant complains were made in the State's rebuttal argument after defense counsel repeatedly argued that Miller was known to "carry a gun," had been "convicted of carrying a gun," and "like[d] to have his guns." Thus, defense counsel's argument clearly invited a response from the State. *Johnson*, 208 Ill. 2d at 113. Second, the State's response to defense counsel's argument was supported by the evidence. Indeed, the parties stipulated that, in 2006, Miller pleaded guilty to aggravated vehicular hijacking while armed with a firearm. However, there was no evidence that Miller had carried a firearm in the years following his conviction. Third, we find the State's characterization of Miller's conviction as having been for "carrying a gun" was not improper where defense counsel also characterized Miller's conviction as such. Accordingly, we find the complained-of remark was not improper.

¶ 86    In sum, having found only two isolated remarks by the State improper, one of which was likely an inadvertent misstatement, we reject defendant's contention that the cumulative effect of the errors deprived him of a fair trial. Moreover, as noted above, the trial court instructed the jury that closing arguments were not evidence and that it should disregard any statement or argument which was not based on the evidence. We, therefore, cannot say that the two isolated remarks affected the outcome of defendant's trial, and therefore there was no error. See *Moody*, 2016 IL App (1st) 130071, ¶ 79; see also *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it.").

¶ 87    Defendant next contends his sentence was excessive. Specifically, he argues the trial court "did not adequately address or consider the multitude of statutory mitigating evidence in this case." We disagree.

¶ 88    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including: "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 89    The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, the trial court has broad discretionary powers in imposing a sentence, which

are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only where the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 90    After reviewing the record, we conclude the trial court did not abuse its discretion when it sentenced defendant to 50 years' imprisonment. The offense of first degree murder carries a sentencing range of 20 to 60 years' imprisonment and where, as here, it is coupled with a finding that the defendant personally discharged a firearm proximately causing the victim's death, there is a mandatory 25-year to life sentencing enhancement. 730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1)(d)(iii) (West 2012). Therefore, the applicable sentencing range in this case was 45 years to life. Because defendant's 50-year prison sentence fell within that range, we presume the sentence is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has failed to make such a showing.

¶ 91    Defendant argues the trial court failed to consider the mitigating evidence before it, leading to an excessive sentence. He maintains the court did not place adequate weight on (1) the fact defendant was a productive member of the community, given his employment from May 2013 until his arrest; (2) the hardship a lengthy sentence would impose on his girlfriend and son, who

relied on him for financial support; (3) the fact he was not a gang member and did not use illegal drugs; (4) his cooperation with the probation officer who prepared the PSI; (5) his prosocial relationships with his family and friends; (6) his lack of criminal history; and (7) the fact, based on his lack of violent history, that the incident was isolated, motivated by excessive alcohol use, mourning, and a uniquely contentious and heated situation.

¶ 92    Defendant essentially asks this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. This we will not do. *Stacey*, 193 Ill. 2d at 209. Moreover, there exists a presumption the court considered all mitigating factors supported by the record absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Here, the record shows all of the mitigating evidence defendant relies upon was before the court in the PSI and the evidence it heard at trial and was argued by counsel. When announcing defendant's sentence, the court noted it had reviewed the PSI, heard the parties' arguments and defendant's statement in allocution. The court also noted that it considered the factors in aggravation and mitigation in light of the evidence adduced at trial and sentencing, and in light of the "particular" and "unique" circumstances of the case, as well as the arguments of the parties and defendant's statement in allocution. The record therefore establishes the court considered the mitigating evidence and exercised its broad discretion to impose a sentence five years above the statutorily required minimum. Simply put, defendant has failed to identify any affirmative indication in the record that the court failed to consider and give weight to the mitigating evidence in this case. See *id.*

¶ 93    In light of this record, we do not find defendant's sentence was greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the seriousness of the offense. See

*Charleston*, 2018 IL App (1st) 161323, ¶ 16. Accordingly, we conclude the trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment.

¶ 94    For the reasons stated, we affirm the trial court's judgment.

¶ 95    Affirmed.